SCHWARTZ v CITY OF FLINT

Docket No. 78-3141. Submitted June 13, 1979, at Lansing.—Decided
September 20, 1979. Leave to appeal applied for.

Plaintiffs, Joseph and Lillian Schwartz, purchased in 1966 a 28-
acre parcel of land in defendant City of Flint. At that time, the
land was zoned A-2, which would permit single-family homes
with a minimum lot size of 5000 square feet. In 1967, plaintiffs
sought to have the property rezoned to C-1, which would permit
multi-family homes and walk-up apartments. Plaintiffs' applica-
tion for the zoning change was tabled until 1971, at which time
the zoning request was denied. Plaintiffs thereafter commenced
suit against the City of Flint, claiming that the zoning ordi-
nance was unreasonable as applied to the subject land. A
consent judgment, rezoning the property to B, which would
permit multi-family and community development uses, was
entered in 1973, but that judgment was set aside shortly
thereafter. A number of nearby homeowners were permitted to
intervene as defendants. In 1974, defendant city, after having
hired an urban development consulting firm to study the area
in which the subject parcel is located, rezoned the subject
property from A-2 to A-1, which would permit single-family
homes with a minimum lot size of 10,000 square feet. The
Genesee Circuit Court, Harry B. McAra, J., after hearing
conflicting testimony as to the economic feasibility of develop-
ing the property as zoned and the impact of any zoning change
upon the surrounding area, entered a judgment in favor of
defendants. Plaintiffs, after being denied a motion for new trial,
appeal as of right. *Held:*

1. For a zoning ordinance to be successfully challenged as

REFERENCES FOR POINTS IN HEADNOTES
[1] 82 Am Jur 2d, Zoning and Planning §§ 15, 33.
   Spot Zoning. 51 ALR2d 263.
[2] 82 Am Jur 2d, Zoning and Planning § 25.
[3] 82 Am Jur 2d, Zoning and Planning §§ 25, 308.
[4] 82 Am Jur 2d, Zoning and Planning §§ 33 *et seq.,* 273.
[5] 5 Am Jur 2d, Appeal and Error § 703 *et seq.*
[6] 5 Am Jur 2d, Appeal and Error § 948.
[7] 82 Am Jur 2d, Zoning and Planning §§ 15, 34, 37, 45.

unconstitutional a plaintiff must prove either that there is no reasonable governmental interest being advanced by the zoning classification itself or that the ordinance is unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question.

2. A zoning ordinance comes to the courts clothed with every presumption of validity.

3. The party attacking a zoning ordinance has the burden to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of property; it must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness.

4. To sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on the property preclude its use for any purposes to which it is reasonably adapted.

5. Review by the Court of Appeals of the findings of a court of equity is *de novo* in nature, with due deference being given to the findings of the trial court.

6. The Court of Appeals is required to sustain the findings of a trial court sitting as a court in equity unless it becomes convinced, upon review of the evidence, that had it heard the evidence in the first instance it would have been compelled to rule contrary to the ruling actually made by the trial court.

7. The Court of Appeals is convinced that, had it heard the testimony in the first instance in this case, it would have been compelled to find that the zoning in question, as applied to plaintiffs' property, is arbitrary and unreasonable.

Reversed and remanded with instructions.

ALLEN, J., dissented. He would hold that the proofs to support the trial court's findings were adequate. In view of the conflicting testimony, the presumptions favoring a zoning ordinance, and the considerable weight to be given the trial court's findings, he would hold that it cannot be said that the ordinance as it now stands is not valid. He would affirm.

OPINION OF THE COURT

1. ZONING — ORDINANCES — CONSTITUTIONAL LAW.

A plaintiff must prove either that there is no reasonable governmental interest being advanced by a zoning classification itself or that the ordinance is unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of

legitimate land use from the area in question in order to successfully challenge a zoning ordinance as unconstitutional.

2. Zoning — Ordinances — Presumption of Validity.

A zoning ordinance comes to the courts clothed with every presumption of validity.

3. Zoning — Ordinances — Burden of Proof — Reasonableness.

The party attacking a zoning ordinance has the burden to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of property; it must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness.

4. Zoning — Ordinances — Reasonableness.

An aggrieved property owner must show that if a zoning ordinance is enforced the consequent restrictions on the property preclude its use for any purposes to which it is reasonably adapted in order to sustain an attack on the zoning ordinance.

5. Appeal and Error — Equity — De Novo Review — Findings of Trial Judge.

Review by the Court of Appeals of the findings of a court of equity is *de novo* in nature, with due deference being given to the findings of the trial court.

6. Appeal and Error — Equity — Findings of Trial Judge.

The Court of Appeals is required to sustain the findings of a trial court sitting as a court in equity unless it becomes convinced, upon review of the evidence, that had it heard the evidence in the first instance it would have been compelled to rule contrary to the ruling actually made by the trial court.

Dissent by Allen, P.J.

7. Zoning — Validity — Factors.

*A zoning ordinance classification is not arbitrary and capricious where the zoning restriction was based upon the determination that other land uses would increase traffic and thereby endanger pedestrians and place a severe strain on the road system, where such other land uses would adversely affect the surrounding property, and where it cannot be said that the finding by the trial court that the zoning classification did not deprive the land owner of economic use of the land was clearly erroneous.*

*Robert E. Childs,* for plaintiff.

*Patrick H. Hynes,* for defendant City of Flint.

*Charles A. Forrest, Jr.,* for intervening-defendants.

Before: ALLEN, P.J., and T. M. BURNS and D. E. HOLBROOK,* JJ.

D. E. HOLBROOK, J. This appeal of right involves the validity of a zoning ordinance of the defendant City of Flint. Plaintiffs brought this action in the circuit court for Genesee County, claiming that the ordinance is unreasonable as applied to plaintiffs' subject land. The trial court, after a full trial, upheld the ordinance.

Plaintiffs raise three issues on appeal, two of which (not pertaining to the substance on the merits) are not sustained by the record and need not be discussed. However, as to the third issue, we rule that the plaintiffs have sustained their burden of proof by proving that the zoning ordinance in question is unreasonable as applied to the plaintiffs' land.

A history of this case is helpful in explaining our ruling herein. The plaintiffs purchased the subject 28 acres of land located in the City of Flint in January, 1966, for $60,000. At that time, the property was zoned A-2, single-family homes with a minimum of 5,000 square feet lot size.

Plaintiff Joseph Schwartz, a longtime licensed residential builder in Michigan, constructed many homes throughout the City of Flint during the period from 1954 to 1971. Included were 29 homes

---

* Former Court of Appeals Judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

on Woodslea, Pine Tree and Green Hill Roads, which comprise the subdivision to the North of the subject 28 acres. These include the homes of Sherwin Palmer and Leo Seide, two of the intervening defendants (who testified in the case) and plaintiffs' own home at 2643 Pine Tree Drive.

The last two homes which plaintiff built in this subdivision were for Dr. Bowles and for Samuel and Florence Gershenson. While plaintiff made a fair profit on all the homes he built in Flint, he lost money on the Bowles home and on the Gershenson home. He estimated that he lost approximately $9,500 on these two homes. Without a proper market for single-family homes if built on the subject property, plaintiffs requested a rezoning from A-2 to C-1 in January 1967. The application was tabled. Four years later on June 8, 1971, plaintiffs' application was removed from the table, and the request to recommend changing the zoning was denied. Then followed plaintiffs' filing of the instant complaint in October, 1971.

Thereafter, a settlement conference was held, and a consent judgment was entered pursuant thereto on July 19, 1973. Upon motion of defendant city, the judgment was set aside and the individual defendants allowed to intervene.

The Flint City Commission retained a New York organization known as Raymond, Parish and Pine, Inc., urban development consultants of Tarrytown, New York, assisted by Eugene Albert, real estate analyst from Croton-on-Hudson, New York. Their report was filed in final form with the city nearly three years after the instant action had been filed. The city then, on its own initiative, rezoned the property from A-2 to A-1 on November 25, 1974.

On March 4, 1975, the actual trial was commenced. Continuances were had, and the trial was

completed on August 3, 1976. The trial took up not more than nine days of time, some of which were half days. On November 22, 1976, transcripts were filed and final briefs were submitted by May 3, 1977. On June 7, 1978, an opinion was issued by the trial court, followed by judgment in favor of defendants entered June 14, 1978. A motion for new trial was filed June 28, 1978, and was denied on July 10, 1978. This appeal was then timely taken by plaintiffs as of right.

In the most recent case of *Ed Zaagman, Inc v Kentwood,* 406 Mich 137, 153-154; 277 NW2d 475 (1979), our Supreme Court, with Mr. Justice WILLIAMS speaking for the Court, stated:

"The appropriate standard for determining the constitutional validity of municipal zoning determinations was succinctly set forth in *Kirk [v Tyrone Twp,* 398 Mich 429; 247 NW2d 848 (1976)] as follows:

" 'The principles and tests to use to determine whether the present zoning of plaintiffs' property is valid was detailed in *Kropf [v Sterling Heights,* 391 Mich 139; 215 NW2d 179 (1974)].

" 'The important principles require that for an ordinance to be successfully challenged plaintiffs prove:

" ' "[F]irst, that there is no reasonable governmental interest being advanced by the present zoning classification itself * * * or

" ' "[S]econdly, that an ordinance may be unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question." 391 Mich 139, 159.

" 'The four rules for applying these principles were also outlined in *Kropf.* They are:

" '1. "[T]he ordinance comes to us clothed with every presumption of validity". 391 Mich 139, 162, quoting from *Brae Burn, Inc v Bloomfield Hills,* 350 Mich 425; 86 NW2d 166 (1957).

" '2. "[I]t is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and

unreasonable restriction upon the owner's use of his property * * *. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness." 391 Mich 139, 162, quoting *Brae Burn, Inc.*

" '3. "Michigan has adopted the view that to sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on his property preclude its use for any purposes to which it is reasonably adapted." 391 Mich 139, 162-163.

" '4. "This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases." 391 Mich 139, 163, quoting *Christine Building Co v City of Troy,* 367 Mich 508, 518; 116 NW2d 816 (1962).' 398 Mich 429, 439-440."

The premise upon which this opinion is written is that, if the ordinance is enforced with the consequent restrictions on plaintiffs' property, the same precludes its use for any purpose to which it is reasonably adapted. We believe that this is true under the facts in this case and has been consistently true from the date of the complaint in 1971 and continuing throughout the proceedings and to the filing of the opinion of the trial court on June 7, 1978. In other words, because of its location and its A-1 zoning, there is no demand for such lots in the city of Flint, and this raw land cannot be developed as required by the ordinance. Of course, nothing is impossible, and there were witnesses who stated that in their opinion the land could be developed under the ordinance. However, there was no offer of evidence that any responsible entity or person would be willing to do so. A principal witness who said the land could be developed for A-1 homes was the intervenor Sherwin Palmer. Mr. Palmer was president of a building

supply company furnishing materials to 400 build-
ers in the Genesee County area. Mr. Palmer stated
that (as of the time of his testimony in July, 1976)
he did not know of any homes being built on A-1
zoned property in the city of Flint. At the same
hearing, Palmer testified as follows:

"Q [by Mr. Forrest, attorney for the intervenors] Mr.
Palmer, in the course of your work as a building—in
the building business, are you familiar with high qual-
ity homes being built outside of the city limits?

"A Yes, sir.

"Q Now, when I speak of high quality homes, I'm
speaking of homes in excess of fifty thousand dollars.

"A Yes, sir.

"Q Do you happen to know how many such homes
are being built in the county at the present time?

"A I couldn't give you an exact number, but there
are, there are quite a few and the trend is upward.

"Q How is the building business right now in terms of
high quality homes?

"MR CHILDS: Where?

"MR FORREST: In the county.

"A The high quality home trend is more stronger
than in the, let's say, moderate to low priced homes.

"Q (By Mr. Forrest, continuing): And how—

"A And has been all the way through the down
period.

"Q But how has it been in terms of the more expen-
sive homes at the present time?

"A It's strong."

Mr. Seide, the other intervenor who testified, did
not testify as to the feasibility of developing the
subject land for A-1 homes. He did testify that he
had listed his home for sale and it was for sale at
that time.

Plaintiffs should not be required to pay taxes on
this property, as they have for the past more than

eight years, without any opportunity to use or develop the same. In our opinion the ordinance, in effect, is taking from plaintiffs the use of their property without just compensation, contrary to the Federal and State Constitutions.

It may be that the intervenors would like to see the subject property developed like their property or see it vacant, similar to a park, private or public. It is interesting to note that only two intervenors testified, and one of those testifying said his property was for sale. The intervenors live in a A-2 zoned area which is about a mile from east to west and four blocks from north to south. To the east of this area is commercially zoned property; to the north is property zoned for commercial and industrial and public utility uses; to the west, property zoned for two and multi-family residential, and general and highway commercial service; to the south is the subject property of this suit and also a public park to the southwest.

The property surrounding the subject 28 acres of plaintiffs is zoned as follows: to the north the area just described; to the south residential; to the southwest semi-public recreational; to the east commercial; and to the southeast commercial. Plaintiffs maintain that their property could be developed and used if zoned C-1 or a modification of C-1 permitting garden-type apartments and multiple homes. It is also noted there is another possible zoning classification, that of B, which permits a mix of single homes and two-family and multi-family homes. Further that there is a demand and a need for such apartments and homes in the city of Flint.

The City of Flint no doubt acted sincerely in zoning the property for single homes. However, it could not see into the future and know of the

developing and unforeseeable events, *viz.:* the lack
of a market demand because of consumer choice to
seek single-family homes outside of the City of
Flint, in the towns and townships in the environs,
and the resulting economic facts precluding devel-
opment of the land for more expensive homes for
which the land had been zoned.

The city relied upon the report of the planning
firm of Raymond, Parish and Pine from Tarry-
town, New York, entitled Dort-Lippincott Neigh-
borhood. This encompasses the area surrounding
the subject property. John Saccardi, an employee
of that firm, and co-author of the report, was
called as a witness by the plaintiffs, for cross
examination under the statute. Parts of his testi-
mony pertinent to this opinion are as follows:

"Q (By Mr. Childs, continuing): Was your original
commission, if you know, to study the Dort-Lippincott
corridor development, excluding the Schwartz parcel
and the Patsy parcel and so forth? Just along Dort and
Lippincott?

"A No. Our original commission, as I understand it,
was to study the neighborhood, with particular empha-
sis to the vacant parcels included in the neighborhood.

"Q How many acres of the purported twenty-eight
acres of the Schwartz parcel are included in the flood
plain?

"A It—the figures that we used are twenty-eight
point seven acres which we calculated in our office and
eleven point one are in the flood plain.

"Q So that would leave approximately seventeen
point six acres.

"A Correct.

"Q Now, of the seventeen point six acres, that result
in your being able to build homes with basements on
each one of the seventeen point six acres?

"A I would believe so, yes.

\* \* \*

"Q All right. Well, now, do apartments furnish more children?

"A Than?

"Q In school population than do single-family homes?

"A No, less.

"Q Less.

"A Yes.

"Q Did you examine the assessed valuation which would be necessary to raise the taxes to support one school child, no matter what type of unit he lived in?

"A We had a meeting with the business administrator from the Flint School system and we talked about the figures, and our general conclusion was that there would not be an overwhelming impact from any of the alternatives we were suggesting, so consequently we stopped there.

"Q What do you mean by overwhelming?

"A In other words, if you look at the chart on page 40, you see that most of the estimated school children populations are low enough that when you relate them to the capacity in the school systems there will not be an over-crowding and consequently not a burden. If the schools were, were very much over-crowded, then we would have gone further with the school impact.

"Q Did you reach any conclusion as to over-crowding of the elementary, junior high and high schools?

"A Yes.

"Q And what conclusion was that?

"A There's excess space in the elementary and the junior high schools, and that the trends in enrollment are such that in the next several years there will be additional space available in the high school.

\* \* \*

"Q (By Mr. Childs, continuing): Now on page 11 of your Dort-Lippincott Report, would you point out the vacant land going back to there? You have talked about deficient housing and you have talked about the vacancy of the City land. And you have talked about the Schwartz parcel. Did you consider the Master Plan of the City?

"A Yes. Part of our task was to look at the Master

Plan and look at the zoning ordinance and to examine the policies reflected by these two documents in relation to what we were suggesting for the area.

"Q At the time you made the study how was the Schwartz parcel zoned?

"A A-2.

"Q Since the study came out, why, the Exhibit Number 9, I believe it is, indicates that it has been rezoned to A-1. As a planner, do you agree?

"A Oh yes.

* * *

"Q Do you know how many single-family homes have been built within the City of Flint, territorial limits, within the last five years?

"A No, sir, I do not.

* * *

"Q Incidentally, how much time did you have to make the study?

"A Our tasks specifically?

"Q Started when?

"A I believe it was July.

"Q Of which year?

"A And we were finished by Labor Day. We had three months to make the study. It had extended beyond that. We prepared a draft report on or about Labor Day. The City Planning Commission then spent sometime reviewing it, and then in October we printed this finalized version and had a subsequent meeting with the planning board after that. So in total I would say five months. Three months of actual data gathering, analysis and planning.

"Q Well, now, do you know the number of single-family units was six hundred and eighty-one built within the territorial limits of the City of Flint in the year 1971?

"A I'm sorry, sir, I didn't, I didn't understand that.

"Q Did you know that the—that there were six hundred and eighty-one single-family units built within the City limits of Flint in 1971?

"A No, I did not.

"Q Did you know that in 1972 there were seventy-

nine single-family units built within the territorial limits of the City of Flint?

"A No, sir, I didn't know that.

"Q Did you know that through May of 1973 there were fourteen single-family units built within the City of Flint territorial limits?

"A No, sir, I didn't know that, either. If, if I may—

"Q Now—

"A Okay.

"Q —just answer my question, please.

"A No, I didn't know.

"Q In order to know how to plan is it not necessary to know what is the demand?

"A Yes. That's why we had an economic consultant working with us.

"Q From Tarrytown, New York, or—

"A No, from Croton-on-Hudson.

"Q Croton-on-the-Hudson. But none from Flint, Michigan, or from the immediate area.

"A No, the City hired consultants from out-of-state. They hired us from New York.

"Q Will you turn to page 15 of your report, please?

Now, before you answer that question, is there any reason why you as a land planner know why single-family units, new construction, has come to a practical halt?

"A In Flint? Or in the country?

"Q I would say—you were retained to do the study in Flint. What about Flint?

"A Well, you know, the economic conditions, the cost of labor, the cost of money, mortgage money, and the market would be the reasons for a slow-down in the construction of single-family homes at the present time.

"Q Would you say a slow-down from six hundred and eighty-one to the first—including the first five months of 1973 was quite a slow-down?

"A Yes.

\* \* \*

"Q All right. Suppose it were open and no carports, no garages, nothing. Any impact between the multiples and the single-family homes?

"A Again it would, it would depend, you know.

"Q Assume it's just lawn. Landscaping.

"A If I could envision the fronts of the garden apartments, which are very attractive, with a lawn, and then across the ways some single-family houses, I could imagine it being a compatible relationship.

"Q A compatible relationship.

"A Yes.

\* \* \*

"Q Now, in part of the study, in order to determine if A-1 is reasonable zoning for these acres, besides the streets and the cost of the bare land and the improvements, did you in turn determine what is the cost per structure on each one?

"A No.

"Q You never did that.

"A No, sir.

"Q In order to do land planning don't you have to determine supply and demand?

"A No, not to do land planning; to do building you would have to do that. But not to do land planning.

"Q But not to do land planning.

"A No, sir.

\* \* \*

"Q Now, I point out to you in particular on page 43 of your report. The last paragraph.

Do you not say in there that 'Assuming careful review of development plans by the Planning Commission and the City Engineer, no inordinate burden on existing City services should be expected to result from any of the options examined'?

"A That's right, sir.

"Q And what now were your options so that we know?

"A They were single-family options and multiple-family options and combinations thereof.

"Q And combinations thereof.

"A Yes.

"Q But throughout this entire study you did not

make a study of the cost of building a single-family home as compared to a multi-family or a town house.

"A Correct.

"Q In reaching your conclusion, am I correct in that?

"A Yes, sir, you are correct.

"Q Don't you think that's really an integral part of land planning?

"A No, sir.

"Q You don't.

"A No, I don't think so.

\*    \*    \*

"Q All right. Would you mind reading this?

"A 'Unquestionably, however, the demand for apartment-type housing is much greater', referring to greater than single-family. 'The City of Flint is not producing a sufficient supply of small unit apartments or condominiums to meet the needs generated by new family formations and by the increasing number of older persons with no children living at home. In the aggregate, these two age groups represent about sixty percent of the City's current populations.'

Should I go on?

"Q All right. Now, of these sixty percent of the City's current population, is it your opinion that sixty percent of the City of Flint would be able to purchase the A-1 type housing that you recommended here?

"A Well, part of them probably would, although—

"Q What part?

"A The older persons with children not living at home. Although the desirability of those age groups to purchase single-family homes on relatively large lots is a very small one. The, the market for town houses, condominiums and apartments strikes hardest and is at this age group, these age groups; it's the young people forming families and the older people whose children have left.

So, yeah,—

"Q So would it not be wise for the people to preserve these people within the City limits instead of having to drive them outside of the City of Flint?

"A Of course."

Mr. Gerald E. Childers, Zoning Administrator
for the City of Flint, was called as a witness by the
plaintiffs for cross examination under the statute.
Parts of his testimony pertinent to this opinion
follow:

"Q All right. Now, following that and the adoption of
the zoning ordinance, there was a so-called Dort-Lippin-
cott Study made, am I correct in that?
"A Yes.
"Q You know when they started making this study?
"A In '74.
"Q In 1974.
"A Yes.
"Q Was that after judgment or before judgment was
entered in this particular suit originally?
"A After.
"Q Afterwards.
"A Yes.
"Q And in doing so * * * who made the study?
"A Firm of Parish, Raymond and Pine.
"Q Where are they located?
"A Tarrytown, New York.

                      *   *   *

"Q I see. But, is it not also true that you originally
recommended to the Planning Commission a B commu-
nity development? Do you have your notes here with
you on this case?
"A Yes, I do.
"Q Would you mind looking at them?
Suppose you look at June 8th, 1971.
Is that it?
"A Yes
"Q Would you mind reading the second full para-
graph?
"A The second full paragraph whereabouts?
"Q Of the Planning Commission minutes of June 8,
1971, page 4294.
"A The second paragraph of that page?

"Q Yes.

"A 'C-1 residential zoning on the property in question would provide no guarantee that development would take place as proposed, and, in addition, existing developments should not be completely subjected to the whims of the market place at any given point in time, although it would seem that a man having a combination of apartments and single-family residences would provide a reasonable use of the developer—for the developer and offer more stability to existing developments.'

"Q All right. Would you also read the next paragraph?

"A 'It would be recommended that a plan and preliminary plat be developed that would leave the southerly portion of the property in single-family classification, and by the use of B residential zoning and community development project approval on the remainder, some assurance could be given on the density of apartment construction, period. In addition, there should be some provision for street connections between this parcel and the vacant acreage to the east.'

"Q Was that your recommendation?

"A Yes.

\* \* \*

"Q Well, wasn't your recommendation for B community development?

"A The recommendation that Mr. Schwartz should consider that course of action.

"Q Yes. And why did you make that recommendation?

"A Because I was concerned that actually that the problems of single-family development was a problem, and I think there was a—but to offer some assurance to the neighborhood that something other than C-1 zoning was necessary.

\* \* \*

"Q Well, now, we have two people to whom we try to be reasonable; one is reasonable to the people who live on Woodslea, right?

"A Correct.

"Q We also have to be reasonable with Mr. Schwartz, is that correct?

"A That's correct.

"Q. Now, is it reasonable to require him to do something which will result in practical insolvency?

"A That's a judgment that has to be made. No, if that was the case, no, it is not reasonable.

"Q All right.

"A That was the whole issue that's involved, I think.

"Q Therefore, if he loses money on the deal, if he can't do it as recommended A-1, if there is no market for A-1, you as a City Planner would deem it to be unreasonable zoning.

"A That's right.

"Q Therefore, is A-1 zoning unreasonable?

"A Based on our consultant's recommendation, no, it is not.

"Q What is your recommendation?

"A I have to go on the basis—I don't intend to be a market analyst or an expert in the financial feasibility of these particular projects. And to me that was the major purpose of this study. Designwise, we can sit down and design anything. But the aspects I think of zoning serves two purposes. One is protecting the existing development, stabilizing the values in the area, and providing for growth-development, and sometimes those two purposes conflict, which I think is the case here. And you have to resolve it.

"Q All right. Now, where else in the City of Flint is there A-1 zoning?

"A As stated during earlier testimony, this area, the area south of Miller Road, and there was one other parcel that wasn't mentioned, C.S. Mott's estate happens to be zoned A-1, too, but—

"Q How large is that?

"A Twenty acres, maybe, twenty-five.

"Q Very expensive home?

"A Yes.

\* \* \*

"Q Now, you have the Dort-Lippincott Study and

page showing the major streets, correct? Is it page 25 you said? Do you have it there?

"A Yes.

"Q All right. Atherton is a main road, or what we call a primary thoroughfare, correct?

"A On the land use—

"Q Yes.

"A —or the major street plan, which is true, it is a major thoroughfare.

"Q All right. What about Terrace Drive?

"A Terrace Drive is shown as a collector street.

"Q What is meant by collector street?

"A Well, I suppose you could get many definitions, but it's primarily a street that's collecting traffic from a specific area and distributing it to your major street system.

"Q All right. In collecting it, how many vehicles are shown?

"A Approximately seven hundred.

"Q And, how many could this collector street handle per hour?

"A Offhand I don't have that information.

"Q All right. The twenty—are most of these streets twenty-six foot roadways?

"A Yes.

"Q What is the volume shown from the Country Club or to the Country Club Apartments along Woodslea?

"A The only traffic data count on Woodslea is six hundred and thirty-four.

"Q Where do you see that, please? I see.

"A Right here.

"Q Six hundred and thirty-four, that's up there.

All right, what does this twenty and twenty-six indicate?

"A Those are pavement widths.

"Q Pavements widths, all right. It shows six hundred and ninety-seven going south on—what street is that?

"A Terrace Drive.

"Q —Terrace Drive. All right. And the width of that is twenty-six feet.

Now, from the Country Club Apartments, apparently six hundred and ninety-seven around—and let's even add—well, we can't, we can't even say they are going over beyond Country Club—beyond the golf club or to the golf club or something like that. Around that twenty foot, where it says twenty in a circle, is that where the golf club is?

"A The golf club. Well, there's a number of twenties there in circles. The—that's going in the direction of the golf club from the intersection of Terrace Drive and Woodslea.

"Q All right. Now, the total traffic at the peak apparently of the circle is nineteen hundred and eighteen, correct?

"A Yeah, that's the average daily volume.

"Q All right. Now, if there were two hundred and fifty-eight apartments built, would it be unreasonable to even double that nineteen eighteen figure? In your opinion as a City Planner?

"A General figures, dwelling units, based—this is based on the Michigan State Highway Department origin-destination surveys; will approximate seven traffic trips generated per dwelling unit per day. That will vary, of course, up and down from there based on type of dwelling unit, the family income and so on.

\* \* \*

"Q But your background was in zoning because you were the Assistant City Planner and the City Planner and now the Zoning Administrator, is that correct?

"A That's correct.

"Q And how many years would that encompass?

"A Total? Twenty-five years.

"Q Twenty-five years. Well, following that was Mr. Schwartz' land, the plaintiff's land, zoning changed? After that?

"A Subsequent to this.

"Q Beg your pardon?

"A You mean subsequent to this.

"Q Yes, subsequent.

"A Yes. Yes, it has been.

"Q What has it been changed to?

"A Changed from A-2 residential to A-1 residential.

"Q Now; there has been heretofor offered in evidence an Exhibit Number 13 entitled the Dort-Lippincott Neighborhood Plan, which has been accepted in evidence. Are you familiar with this plan?

"A Yes.

"Q Now, in referring to this particular plan, and I show you the exhibit, please—thank you—there were two options available in that plan, were there not?

"A I believe so.

"Q Was not one; the first conceptual approach, as they say, in that particular plan based upon * * * exactly what you said we have stipulated to in open court?

"A To, to a certain extent. I'd say the multiple-family option that was shown in the study—

"Q That was one option which was reasonable in their opinion.

"A —showed a potential multiple-family development with a space buffer or single-family home buffer in the area.

"Q Yes. All right. And then the other plan was for—the other option, as they put it, optual—optional conception was to rezone it to A-1. Is that correct?

"A That's correct.

"Q Has it been so rezoned to A-1?

"A It has been.

*    *    *

"Q Did you not originally suggest the B plan at the first zoning hearing which was submitted to the City Council?

"A I did suggest that as an alternative approach to asking for C-1.

*    *    *

"Q (By Mr. Childs, continuing): Did you receive a letter like this Proposed Exhibit 16 from George M. Raymond who drafted—one of the drafters of the Dort-Lippincott Plan?

"A Yeah, this is addressed to me, yes.

"A Yes. Were you subpoenaed to bring in all of your

original letters, correspondence, file, concerning that particular area?

"A I have all of the minutes and the plans. I don't know whether I have all the specific correspondence.

"Q Well, the subpoena specifically covered all correspondence, originals.

I show Plaintiff's Proposed Exhibit 16 to opposing counsel, Mr. Hynes, Mr. Forrest.

"MR. FORREST: I would, I would object, your Honor. I believe that this letter is too much in the nature of an ultimate conclusion. I think we have to have more of the, of the rationale behind this conclusion before this letter can be introduced into evidence.

"THE COURT: Mr. Hynes?

"MR. HYNES: I'll join in Mr. Forrest's objection, your Honor.

"THE COURT: All right, let me see the letter.

"MR. CHILDS: The letter is being presented to the Court.

"THE COURT: Did you, did you receive this letter, Mr. Childers?

"THE WITNESS: I'm sure I did.

"THE COURT: Did you solicit this letter?

"THE WITNESS: It would assume—appear it was in response to an inquiry. I do not recall whether it was a verbal inquiry or written inquiry.

"THE COURT: By you?

"THE WITNESS: Right.

"THE COURT: All right. I'll admit it into evidence.

"MR. CHILDS: Thank you very much, your Honor.

"Q (By Mr. Childs, continuing): What does that have to do with the traffic pattern specifically?

"A The letter was, to some degree, the response of the cost of providing additional access to the area, as to what it would do to the land costs for Mr. Schwartz as it relates to the number of units that might be developed on the property.

"Q Yes, thank you.

Does it not say in its last paragraph, 'An increase in number of units of that order would, however, have relatively little impact, inasmuch as all of the traffic

generated would be channeled directly onto Dort Highway without affecting existing residential neighborhood'?

"A That's what it says. And, of course, I think that reflects, of course, a situation that does not exist and was one of the proposals of Raymond, Parish, Pine Study that there be road access developed out to Dort Highway.

"Q I see.

"MR. FORREST: May I see that letter again?

"Q (By Mr. Childs, continuing): Now, actually, Mr. Childers * * *

What's the date of that letter?

"MR. FORREST: August 28, 1974.

"MR. CHILDS: All right.

"Q (By Mr. Childs, continuing): In Plaintiff's Exhibit 8, which has been admitted into evidence, you made a so-called Planner's Comments of June 8th, 1971, which I presume would be yours.

In the third paragraph there, what does it say about traffic?

"A I don't see where it says anything about traffic in the third paragraph at all.

"Q The part that's underlined.

"A It says, 'It would seem that a plan having a combination of apartments and single-family residences would provide a reasonable use for the developer and offer more stability to existing developments.'

* * *

"Q All right. Now, in the Schwartz parcel, if traffic would be channeled through out lot A, and I asked you about the location of stop signs before, what if there was a no right turn sign here? How would the traffic be channeled?

"A If there was no other means of access, you had a no right turn movement there, they would either have to go straight down—is that—I can't—Greenhill, is that Greenhill?

"Q Greenhill Lane.

"A And most likely then would cut over to Terrace and go down to Mohawk.

"Q In other words, they would make a left turn on Woodslea.

"A Either that or go down Greenhill Lane.

"Q All right. How many homes are there in Woodslea Drive on this side towards his apartment buildings? On Woodslea Drive.

"A Well, other than the two that are shown there right at the corner, Woodslea and Greenhill, I don't think there are any homes. Single-family homes.

"Q In other words, by where it says 762 and where it says 33.

"A Right.

"Q Would not be affected, is that correct?

And this building over here, which I'll just put a nine in, that is one of his existing apartments, is it not?

"A Right.

"Q All right. What is the traffic pattern for his existing apartments?

"A You come out to Terrace Drive and, of course, can go out Woodslea or they can go south on Terrace Drive out in that direction.

"Q Could the—Terrace Drive is vacant on both sides, is it not?

"A That's right.

"Q All right. Now, if they continued along Terrace Drive and went down there to Mohawk, they would come out on to Dort Highway, would they not?

"A That's right.

"Q Would that affect any of the traffic increase on Woodslea? Assuming there was no right turn from the out-lot A.

"A What traffic are you talking about, traffic in existing apartments or potential traffic from the parcel under litigation?

"Q From the potential apartments.

"A Okay. Because you just switched your talk over to what that traffic over in the apartments was.

"Q I'm sorry

"A Other than the four houses at the corner, the houses down Greenhill Lane, if people abided by a no

right turn movement, it would only affect then that group of houses on Greenhill and the ones at the corner. And then, of course, once you got down to Mohawk, some of the traffic then would relate to the Mohawk traffic, or the Mohawk homes.

"Q Now, on the Dort-Lippincott Study, did not they say that they could provide for commercial or multi-family development?

"A I'm not sure I understood what your question was.

"Q I'm referring to page 36, paragraph which I have outlined in pencil, as being one of the options. The town house units. Would you read that, please?

"A 'The town house units that would result would represent an increase of only twenty-eight units over the sixteen lots now platted and the twenty-eight additional lots that could be accommodated by subdividing the remaining areas along Terrace Drive. In terms of number of bedrooms, however, the two schemes would be equal. The traffic from the town houses could be accommodated by the existing road system or through Route B, if provided.'

*  *  *

"Q Does he own a narrow strip of land to the south of the twenty-eight acres in question running from his property to Woodslea Road?

"A Yes.

"Q That's designated on most maps in the subdivision plat as out-lot A, is that correct?

"A That's correct.

"Q Would that permit vehicle access and ingress and egress through this subdivision? And by this subdivision, I mean the subdivision to the south.

"A I would assume that that's what would be used for access, right. Basically it is the only access point there that touches a public road at the present time.

"Q Well, the plat was platted with this out-lot A permitting egress to this area to the north, wasn't it?

"A That was the intent.

"Q Who platted this subdivision?

"A Mr. Schwartz.

"Q If and when this area is developed, Mr. Childers,

is there any way that you're aware of that the City could prohibit ingress and egress through this out-lot?

"A Oh, I don't think so. Ownership is with Mr. Schwartz, as is the major parcel that we're talking about.

"Q As a planner and having knowledge of traffic patterns and traffic requirements, is it feasible or reasonable to prohibit traffic from turning right at the south end of out-lot A? Is there any justification for that?

"A Well, you can do a number of things I think in traffic engineering controls to try to eliminate problems that might occur. I don't—you don't too often see it at a residence intersection such as that, but I think it would be possible. But the difficulty of enforcing it would be another matter.

\* \* \*

"Q All right. If a resident owner, land owner, in this twenty-eight acres parcel, the Schwartz property in question, wanted to head toward downtown, which way would be normally—which route would he normally take?

"A With the present degree of access, I would think he would go to the right and follow Circle Drive around to—I draw a blank on the street name, but, anyway, approaching Saginaw Street. At least that's the way I would go if I were there heading for downtown.

\* \* \*

"Q All right. If you take even twelve hours a day as opposed to twenty-four—correct me if I'm wrong, my math is pretty bad—how many cars would that permit in a twelve-hour day? Twelve times six hundred, right?

"A That's right.

"Q And that would be \* \* \* seventy-two hundred. Correct?

"A That's right.

"Q Being seventy-two hundred, is there even any estimate—calling it at twelve instead of a twenty-four hour count, is there any estimate of traffic count of any of the options set forth in the Dort-Lippincott Neighbor-

hood Report which even approaches seventy-two hundred per day?

"A No.

"Q Using a twelve hundred day—twelve hour day.

"A No, there aren't any.

"Q Even with Mr. Schwartz' proposal.

"A That's right.

"Q Now, actually, the report, which was made while this lawsuit was in process and setting forth these estimated figures, gave various options, did it not?

"A Yes.

"Q Now, would we say that some are more reasonable than others?

"A Reasonable in what sense?

"Q From a planning sense.

Are you all right?

"A Yeah.

"Q You want to step down a minute?

"A No, I just moved in the wrong way.

Certain planning considerations—I guess the proposals for developing for single-family make more sense if you were looking from the stability of an area.

"Q You say they make more sense.

"A Right.

"Q They would be more reasonable than the town houses, is that it?

"A Yes.

"Q Was the town houses one of the options?

"A Town houses, apartments, I think were options.

"Q In fact, that was the first one that was discussed, was it not?

"A Right.

"Q And then Raymond-Parish came up and said we prefer the A-1.

"A Right.

\*    \*    \*

"Q Actually today as you sit here, in all honesty, would you recommend now in your expert opinion that Mr. Schwartz' parcel be A-1?

"A I think it is desireable.

"Q It is desireable, but is it reasonable?

"A Over a long period of time, it's possible it is.

"Q All right. How many years time?

"A Right now I couldn't answer that.

"Q You have no crystal ball.

"A No.

"Q Now, is it not true that there is a difference between attempting to get something done and yet the economic demand and supply requiring something be done?

"A At any given point in time that is a problem.

"Q Do you know how long Mr. Schwartz and Mrs. Schwartz have owned this parcel and paid taxes on it?

"A I would—pretty close to ten years I would think.

"Q Have they had any economic return from it?

"A Not that I'm aware of.

"Q Would you think that the people, the lone houses east of out-lot A and the houses west of out-lot A, which is really an extension of Greenhill Lane, get benefit from this? Vacant land?

"A To a certain extent, right."

Mr. Clare Walters Farrow, a real estate appraiser of Flint, Michigan testified in part as follows:

"Q Will you please define [w]hat you mean by real estate appraiser?

"A We determine valuations of properties, new and used, for mortgage purposes, also for sale purposes; base valuations on market conditions as they exist at the time.

"Q How long had you been in the real estate work?

"A Twenty years.

"Q During those twenty years who have been your respective clients?

"A I have made appraisals for Genesee Bank, Citizens Bank, Detroit and Northern Savings and Loan, several mortgage companies out of Detroit, also for the Federal Government.

"Q Have you built and sold any homes in Flint and vicinity?

"A Yes. In nineteen * * * I believe it was 1968 we built several homes over on the east side.

"Q You were in the military for a while?

"A Three years.

"Q Now, what has been your appraisal experiences, particularly in reference to F.H.A., for example?

"A Well, I worked for the Federal Government for eight years. I was the subdivision appraiser and multi-family appraiser which consisted of appraising nursing homes, apartment units, and also determining feasibility for subdivisions that might be put on for F.H.A. insurance on the financing.

"Q Did this include town house projects?

"A Yes.

"Q Now, within what radius of Flint does this include?

"A Well, the Flint service office had the—it would be north of Wayne County and Oakland County, all the way to the Alpena and eastern half of the State.

"Q And it was your responsibility to do the actual appraisals, is that correct?

"A Yes.

"Q Are you presently a free lance appraiser?

"A Yes. Fee appraiser.

"Q If I may use that expression. And in doing so have you appeared in court as an appraiser in various cases?

"A Yes.

"Q What type of cases, please?

"A Oh, basically the cases are condemnation cases where there is a discrepancy between the two, two parties. In some cases the State is taking the land, in other cases the City was taking the sites.

"Q Have you appraised multi-family homes?

"A Yes.

"Q Apartments?

"A Yes.

"Q Townhouses?

"A Yes.

"Q Single-family homes?

"A Yes.

"Q And you say your experience has covered about how many appraisals in round numbers?

"A Oh, round numbers, seventeen, eighteen thousand.

"Q Could you tell us, for example, besides enumerating some of the immediate clients, could you enumerate some of the out-state affiliations who have retained you as an appraiser?

"A I have—basically it's for the mortgage companies in Detroit; City Mortgage Company, Diamond Mortgage Company, Tri-City; several of the banks, First—J.L. Hudson's Credit Union, various clients.

"Q Have you appraised for the Argonaut Realty?

"A Yes, General Motors Argonaut Realty.

"Q That is a subsidiary of General Motors, correct?

"A Yes.

"Q Have you appraised for the Chase Manhattan Bank in New York?

"A Yes.

"Q Are you qualified to appraise in the Flint area and Detroit area for the—what's familiarly know as Fanny Mae?

"A Yes.

"Q Are you a member of any professional societies?

"A I'm a senior member of the Society of Residential Appraisers.

"Q And what does that mean?

"A Well, it's a national organization which you earn certain designations. I happen to have the senior residential designation.

"Q Which means what?

"A That actually I'm qualified to go in practically any state in the union and go into the appraisal business.

"Q I see. Do you think that you are familiar with the entire Flint area?

"A Yes.

"Q Are you familiar with and have you actually viewed the instant site?

"A Yes.

"Q Have you physically visited the premises?

"A Yes.

"Q As you viewed the land as shown on this diagram that has been put up here, and, of course, which involves this instant real estate here,—

"A Yes.

"Q —the plus or minus twenty-eight acres do you know the present zoning of that land?

"A The present zoning is A-1.

"Q Which means what?

"A That the sites for single-family residents must be ten thousand square feet or more.

"Q Does it give the size of the building?

"A No.

"Q All right. What is—when this law suit was started originally how was it zoned.

"A A-2.

"Q Which means what?

"A Five thousand square feet or more.

* * *

"Q Thank you. All right, now, with that before you as platted or suggested plat, how many single-family homes could be built according to Defendant's Exhibit A?

"A That shows thirty-five sites.

"Q And are the lots all of the same size?

"A No.

"Q Is there a flood plain shown?

"A Yes.

"Q What is the total number of acreage?

"A According to my notes, the complete site was twenty-eight plus acres.

* * *

"Q (By Mr. Childs, continuing): Do you know the availability of vacant land within the city limits of Flint for A-1 or A-2 zoning?

"A Availability of vacant land you say? Or—

"Q Yes, for new construction.

"A It's—the A-1 classification of zoning in the City of Flint is practically nil. There's only, only two locations other than the subject property that are zoned A-1.

"Q Where are they?

"A The one parcel is south of Miller Road, which is basically estate-type properties, and the other parcel that is zoned A-1 is around the extremities of the Flint Golf Club, which is in the Country Club Manor. Other than that, to my knowledge, there's no A-1 zoning other than a couple of sites that are being rezoned at this time.

\* \* \*

"Q Could you give us the number of homes in A-2 or A-1 classification that were sold within, say, the last five or six years? If you know.

"A Existing homes?

"Q Yes.

"A I used the—clarify this. I used the multiple listing service for my data and it's comprised of sixty offices which are not all the offices, so therefore, the totals that I would give would not necessarily be a true count. But I feel that it is a good rule and indication of the total market as far as percentages.

In the—in 1974, I, I have broken down in categories, in the twenty-five to thirty thousand, thirty to forty, forty to fifty and fifty thousand in the City and in the suburbs, and also for the first three months of 1975. I do have that data.

"Q All right. Could you give that to us, please?

"A In 1974 there were ninety-three homes sold in the twenty-five to thirty thousand dollar category in the City of Flint. In the thirty to forty thousand dollar category there were forty. And in the forty to fifty thousand there were sixteen. And in the over fifty thousand dollar category, seven. Now, that again is this multiple listing service which is comprised of sixty offices.

In the first three months of 1975, in the twenty-five to thirty thousand dollar category, there were fourteen homes sold. In the thirty to forty thousand category, fourteen. In the forty to fifty thousand dollar category, none. And in the over fifty thousand dollar category, one.

\* \* \*

"Q Do you know of other lots in Flint, where they're

located, of a similar type to those of the Country Club area?

"A There are several lots available in the City of Flint. Eldorado Vista would be considered similar price range of some of—of homes are somewhat similar. There are thirty lots available in this particular subdivision. It is zoned A-2. In the past two years they have sold seven sites. Eight sites.

There are lots available in the Evergreen Subdivisions. The one subdivision between Lapeer Road and Lippincott Boulevard has approximately thirty—now this is all from a physical inspection and the figures could be off one or two lots, depending on what—there are thirty lots available in that area. Two of the lots have basements in that appear to be standing idle.

Then in the Evergreen Subdivisions by Court Street, which are—were developed by Whittier Building Company, there are six, six or seven lots available in there. These are also A-2.

There are several lots in the north-eastern section of Flint. I suppose that Rollingwood would be the familiar name. This probably would not be in the same price range category. There are lots available, there's vacant land available for development there.

There's also vacant parcels basically in the northern section of the City where the vacant land is that's developable. Carpenter Road area there's several parcels that could be developed, and in this Rollingwood area there are several parcels that could be developed. Some of them on the edge of the river.

There are—Mr. Gerholz has some sites that he can—could develop. He has enough ground to develop about forty sites, but he has refrained from doing so because the market for this type—

* * *

"MR. CHILDS: May the, may the witness continue?

"THE COURT: Yes, he may continue.

"THE WITNESS: He has sites for—he has developed sites for * * * thirty homes, single-family type, in the Westgate Subdivisions.

He has sites for twenty-five sites in the Sunset Village area. I use Sunset Village because everybody's

familiar with that particular area. The subdivision would be Glendale. These sites are actually developed. These could be used—his plans are to use them for single-family homes.

He has available land for forty more single-family homes in the Westgate area, and these he has refrained from developing because the market has diminished.

There are—Mr. Schwartz also has eighteen lots available on Terrace which has been mentioned previously.

"Q (By Mr. Childs, continuing): Now wait a minute, on Terrace. That is not including the twenty-eight acres with the Flint—

"A No, these are developed lots that could be used.

There are other scattered lots, but they would not qualify as far as for this particular type of building.

"Q Now, in making an appraisal with your experience with the F.H.A., would it be reasonable for Mr. & Mrs. Schwartz to develop the instant real estate?

"A In my opinion, it would not be feasible at this time.

"Q Why not?

"A Lack of market demand as opposed to the costs involved.

"Q Now, when you say lack of market demand, that is based upon your own experience, as well as your researching into the matter?

"A Yes.

"Q Where is the market demand?

"A The market demand is strictly in the suburban areas.

"Q For single-family homes.

"A Yes.

"Q All right. Now, if this were platted, whether A-2 or A-1, would there be a market demand?

"A In my opinion, no.

"Q Could 235 homes be built there?

"A If you disregarded cost of development, yes, of course, 235 homes could be built anywhere.

"Q Are 235's built on ten thousand square foot lots?

"A No.

"Q What do you mean precisely by 235's as I have used the term?

"A Well, I think a lot of people have a misinterpretation of what 235 is. Actually 235 is not a type of home, it is a type of financing. The house itself is actually built under the regular sections of Federal Housing Administration, which is a—just a regular house; it's built with the same inspections and everything else. The 235 aspect of it is strictly a vehicle of financing.

"Q Is it for a particular type of individual or family?

"A Basically it's a subsidized deal. The interest rate is subsidized and also payments according to the abilities of the people that are put in the properties.

"Q To pay, is that correct?

"A Their ability to pay.

*    *    *

"THE WITNESS: I, I think that I did. I think he was asking me whether I would recommend to a lending institution as to whether or not this was a—

"MR. CHILDS: No, to an F.H.A.

"THE COURT: That's just what I was afraid of.

"MR. CHILDS: To F.H.A.

"THE COURT: To F.H.A.

"THE WITNESS: All right. They are an insuring institution. As to whether or not this particular proposal would be feasible or not.

"Q (By Mr. Childs, continuing): And your answer?

"A No.

"Q Why not?

"A Not feasible at this time due to the costs and the market demand. And the availability of other sites as to how they would—if there were other sites available and the costs were up about the same amount as what this would be, then I would say it is feasible, but there are other sites that are available for far less and therefore it would not be a feasible proposition.

"Q Knowing the feasibility, the market and the demand, I reiterate: Should this be either A-2 or A-1?

"A There would be less cost per site involved under the A-2 zoning as opposed to the A-1 zoning. Therefore—

"Q But if it was A-2 zoning, could he sell them?

"A It would be doubtful that they could even be sold at a reasonable profit under the A-2 zoning.

"Q Now I'm talking about new site construction.

"A Yes.

"Q I'm not talking about existing homes.

"A No.

"Q Do you know of any existing homes that are for sale on the issue—on the—in the immediate area, namely on Woodslea, Woodslea Drive—Avenue?

"A Well, there have been several for sale, yes.

"Q Do you know how long?

"A Some of them have been on the market for two years or so.

"Q Have they sold?

"A Not to my knowledge as of two or three days ago.

"Q If these were very low-priced homes would they be salable?

"A Oh, a low-priced home is salable practically everywhere in the City of Flint. You would be disregarding costs in order to achieve that, though.

"Q Would that be comparable to the homes that are on Woodslea?

"A No.

\* \* \*

"Q (By Mr. Childs, continuing): If the A-1 or A-2 zoning is permitted by this Court and Mr. Schwartz would go ahead and build homes there, are they salable, would they be salable?

\* \* \*

"THE WITNESS: To answer the question as a point-blank answer I would have to say yes. However, Mr. Schwartz would certainly not make any money. Anything is salable at a price. Now, if you're going to disregard costs and disregard profit and everything else, yes, it could be sold. But to be sold and come up with a reasonable profit, no. The market wouldn't stand it.

"Q (By Mr. Childs, continuing): As an F.H.A. appraiser, as an appraiser for conventional mortgages, as a builder yourself, as a land developer yourself, would

this land—and this suit has been pending, I believe, since 1971—be marketable without a loss?

"A Under A-1 and A-2?

"Q Yes.

"A At this time there would be a loss. There would be a substantial loss.

"Q There would be a substantial loss.

"A Yes."

Mr. Aaron J. Blumberg, real estate broker, marketing analyst, manager of real estate, with a commendable academic record including a bachelors degree and a Ph.D. from the University of Pennsylvania, testified he had been acquainted with the Flint area for the past 15 years. He did many studies in the Flint area, including the economic study on the basis of which the J.L. Hudson Company decided to go into the shopping center which is now known as the Genesee Valley Mall. He has worked for many banks and other lending institutions in the area as an appraiser.

He testified in part as follows:

"Q (By Mr. Childs, continuing): Now, the next thing is, have you had an opportunity to view the territory of the City of Flint, in particular, concerning the approximately twenty-eight acres?

"A Yes, I have.

"Q How many times would you say that you have?

"A I'd say five or six.

"Q And in doing so would you tell us how you went about it.

"A I drove and walked through that particular parcel —I didn't drive through the parcel, I walked through that parcel. I drove and walked through the neighborhood immediately adjoining it.

*   *   *

"Q All right. The next question is, what did you find

is going on in the market place insofar as single-family homes are concerned in the City of Flint?

"A The question that I addressed myself to was, are single-family homes on ten thousand foot lots, or on the Schwartz parcel, indeed marketable in today's market or any foreseeable market that I could see. That was the question that I tackled.

"Q And that was—actually you're talking about buy-sell now.

"A Buy-sell, right. Real honest to God live transactions.

"Q All right. And in doing so what did you do?

"A Well I thought I might get some help from this Raymond, Parish, Pine report—

\* \* \*

"Q (By Mr. Childs, continuing): When did you make the study?

"A I made this study last month and I studied a period of time commencing at the beginning of January of 1970 and going through 1974. I took a five-year period of time for my analysis.

"Q All right. Now, in the five-year period of time of analysis, what did you find as to the buy-sell of single-family homes in the City of Flint? And from what sources did you derive it?

"A I wanted to find out how many houses in the City of Flint, from January of 1970 through December, 1974, were actually sold in a—in the high income brackets, and my definition of high income brackets was approximately fifty thousand dollars or more. And the reason I took fifty thousand dollars or more is because on A-1 zoned land in Flint you can't deliver a house for anything under—a house and lot for anything under fifty thousand dollars. So I wanted to see how many real actual transactions had occurred in the City of Flint over that five-year period in that price bracket, and I found a total of—

"Q Now where did you go?

"A Oh, yes. I went to the, to the building permit office.

"Q All right.

"A And on the building permit. And I went through all the building permits for single-family homes that were issued during that period of time.

"Q In the City of Flint?

"A In the City of Flint.

"Q All right. And what did you find in the City of Flint and give us the specific year.

"A Well, what I tabulated was the value of the house on the building permit. Now the value of the house on the building permit is not the market—not the sale price of house and lot. On the building permit they just value a major portion of the house. But not the lot. Now, it is common practice in, in the business that I'm in to multiply that by two and that gives you a fair approximation of what the house and lot would sell for on the market to a customer. So what I really tabulated was their estimated building cost of homes, * * * of twenty-five thousand dollars or more.

"Q As—was this figure twenty-five thousand dollars or more shown on the building permit?

"A Yes, it was. Yes.

"Q All right.

* * *

"Q (By Mr. Childs, continuing): Now, excuse me just a minute. When you say your count, did the building permits which you examined—what location did you go to, I want to know that specifically.

"A Oh, I went to the building—to the office of the building inspector in the City of Flint.

"Q I see. And exactly what data did you examine, the application or the building permit itself?

"A No, the building permit.

"Q The building permit. And, now, when you talk about these various figures, showing value as usually shown on a building permit in order to determine the cost as you well know, with what figure did you start on the building permits?

"A The—I started with—I made a tabulation of the number between, between fifteen thousand and nineteen nine, between twenty thousand and one dollar

short of twenty-five thousand, and twenty-five thousand or more.

"Q All right. Did you in these, in all of these categories, or did you confine it to one category?

"A The category that I was primarily concerned with was the, was the higher category, twenty-five thousand or more, because that's the only one which relates to the Schwartz parcel. But I wanted to fill in my background so that I knew where I have gone. I wanted to look a little bit under, you see. But I confined my analysis just to the kind of house which could be built on this particular parcel of land.

"Q All right. In other words, the building permit, if it says twenty-five thousand dollars or more on it, that's what you're talking about.

"A That's correct.

"Q And this is within the territorial limits of the City of Flint.

"A That's correct.

"Q All right. Now will you give us the specific year. Did you divide them up into years?

"A Yes, yes, I divided by years and I added them together.

I thought that piece of paper was there.

Is your query do you want me to read you by years the total number?

"Q What you found.

"A Yes.

"Q This exactly what you yourself found now.

"A Yes. I found one in 1970; five in 1971—

"Q Now take it easy. One—because I want to write this down, too. One in 1970.

"A —five in 1971; six in 1972; nine in 1973, and seven in 1974. Those five figures add up to a total of twenty-eight.

"Q In other words, twenty-eight homes built within the total City of Flint with building permits having been issued from 1970 on in excess of twenty-five thousand dollars.

"A That's correct.

"Q All right. Now, will you explain why you adopted

the figure of twenty-five thousand dollars as the minimum.

"A The A-1 zoning, according to the planner, and I take him as an expert planner, would take an average house of about two thousand square feet. And I—the expert planner and the appraisers tell me that the average cost per square foot is about twenty-five dollars a square foot. Multiply two thousand square feet by twenty-five dollars and I get fifty thousand dollars for the house.

There's got to be some value to the land. What that is I'm not prepared to testify to, but it must be in excess of fifty. So therefore the house and the lot have got to be delivered for something in excess of fifty thousand dollars. And that's why I took that figure.

"Q All right. Out of the entire City of Flint then there were twenty-eight—these are new homes.

"A Yes.

"Q Did you have an opportunity to examine the building permits for any type of single-family town houses or apartments?

"A No, I did not examine that

"Q Did you have an opportunity to visit the surrounding areas outside of Flint?

"A Yes, I did.

"Q And what did you find?

"A Well, when I looked at this small volume of activity—now I have been in and around Flint for a long time and I know that there are more houses being built and sold than twenty-eight in this area. So I went to Grand Blanc and Grand Blanc Township to see what was doing there. And I made a similar analysis in Grand Blanc and Grand Blanc Township, because I wanted to find out where the market really was for these high priced houses or large single-family lots.

"Q And the first one was where?

"A Grand Blanc and Grand Blanc Township.

"Q All right. What did you find in Grand Blanc?

"A In, in Grand Blanc, during the same period of time, that is, January, 1970, through December, 1974, I found a hundred and nineteen houses in that category.

"Q As compared to the—

"A Twenty-eight.

"Q —twenty-eight in Flint.

"A In Flint, correct.

"Q That was for 1971.

"A That's correct.

"Q All right. What did you find in Grand Blanc for 1972?

"A In Grand Blanc in seventy—

"Q Two.

"A In 1972?

"Q Yes.

"A Oh, seventeen—no, wait, I beg your pardon. Wrong column. Thirty-seven in 1972 in Grand Blanc.

"Q All right. In 1973?

"A Ten. Ten.

"Q. Ten.

"A Ten.

"Q In Grand Blanc. And in 1974?

"A Nineteen.

"Q Nineteen?

"A Nineteen, yes.

"Q That makes a total of how many for that period?

"A A hundred and nineteen

"Q As compared to twenty-eight in Flint.

"A That's correct.

"Q Territorial limits.

"A Right.

"Q All right. Now, what was the other area that you examined?

"A Grand Blanc Township.

"Q Grand Blanc Township?

"A Township, yes.

"Q All right. And what did you find there?

"A I found during that five-year period a total of five hundred and nine homes in that area.

"Q New homes?

"A In that price range, at fifty thousand or more.

"Q These are new homes?

"A These are new homes. Yes.

\* \* \*

"Q —starting with the first year.

"A Yes.

"Q Where was the market. In the second where was the market and in the third year where was the market for single-family homes.

"A Well, insofar as a price—houses in that category are concerned, increasingly the market is in the suburbs.

"Q And not—

"A And not in the city. Increasingly you find more and more sales in, in the suburbs and a smaller and smaller number of sales in the city.

"Q Now, in—assuming a builder came to you and wanted to build single-family homes and you have made your market analysis for these five years, take any—take the first year right through the fifth year, what would be your conclusion?

"A I would suggest that if he wants to be in business he goes where the action is, and the action is not in the City of Flint; the action is in Grand Blanc, in Grand Blanc Township and in Flushing primarily for higher priced houses.

\* \* \*

"Q Now, in your analysis of the building permits for single-family homes within the City of Flint, if a builder came to you and asked if he should build A-1 hoursing on the Schwartz parcel, what is your conclusion, from financial return?

\* \* \*

"THE WITNESS: My answer is that it would be very highly speculative and I would hesitate to recommend that anybody get involved in a subdivision of that type on that piece of land.

\* \* \*

"Q (By Mr. Childs, continuing): The most important thing I would say is this: From the viewpoint of a market analyst and having—being a licensed real estate broker, would you give an opinion to Mr. Schwartz

that he should build A-1 or even A-2 homes on the approximately twenty-eight acres that's in litigation?

"A No, I do not think those houses are marketable in the Flint area market. There's no wall around the City of Flint which stops competition from the suburbs from coming into the City of Flint. It does. You just can't draw a wall around a city and say that it doesn't compete with anything else. Surely it does, your Honor. And this land does compete with other projects of like type and of like price, other places nearby. And I don't see how you can analyze the market for this piece of land by building a Chinese wall around the City of Flint.

\* \* \*

"Q In fact, as a result thereof, forgetting about the value of land, forgetting about land planning and so forth, would it be possible to build low income housing, for example?

"A Oh, absolutely.

"Q If Mr. Schwartz were willing to take the loss.

"A Yes. Yes, he could put public housing on there so long as he's got a ten thousand square foot minimum lot. Subsidized housing under one of the federal government programs. Surely.

\* \* \*

"Q (By Mr. Childs, continuing): Now, will you turn to the page which shows the street map of the area involved. Which had the figures on showing traffic flow.

"A I believe it is page 25.

"Q 25? Now, in looking at that particular page there and examining the streets, the widths, does it embrace the area which is the subject matter of this litigation?

"A It does.

"Q All right. As a result of the mathematics and your conversations with the Traffic Engineer's employees, or the City's employees, can these streets handle traffic as projected?

"A Easily.

\* \* \*

"Q (By Mr. Childs, continuing): Now, my question again is this to refresh your memory: Is—are these

streets qualified in capacity to handle Mr. Schwartz' projected garden-type development on the plus or minus twenty-eight acres?

"THE COURT: What streets?

"A Yes, they are.

"THE COURT: Let's get it down so we're tied down to what streets you're talking about, Mr. Childs.

"MR. CHILDS: I'm talking about the streets I have just finished; Terrace Drive, Cherokee, Manitou, Eldon Baker Drive.

"THE WITNESS: Yes, they, they certainly are. Seems to me they were designed to carry heavy traffic out of that lot—out of that parcel. That's why they're so wide."

The evidence shows that the school system and the street and road system are adequate to accommodate the development of the plaintiffs' land under A-1, A-2, B or C classification. These plans were considered in the Dort-Lippincott area report. Their preference was for A-1 zoning; however, it was also favorably mentioned that a multi-family development, with a space buffer of single-family homes, was another option.

We are convinced that it has been shown under all the evidence, including that which has been restated herein, that if the ordinance is enforced the consequent restrictions on plaintiffs' property preclude its use for any purpose to which it is reasonably adapted.

We review on appeal the findings of a court of equity *de novo,* with due deference being given to the findings of the trial court, *Barnett v International Tennis Corp,* 80 Mich App 396; 263 NW2d 908 (1978). This Court is required to sustain the findings of the court below unless it becomes convinced, upon review of the evidence, that had it heard the evidence in the first instance it would have been compelled to rule contrary to the ruling

actually made by the trial court. *Salvador v Connor,* 87 Mich App 664; 276 NW2d 458 (1978), *lv den* 406 Mich 966 (1979).

We are now convinced, upon review of the evidence, that had we heard the evidence in the first instance we would have been compelled to rule contrary to the ruling actually made by the trial court. Therefore, we are constrained to reverse, enjoin defendant from enforcing the unconstitutional classification, and remand the matter to the appropriate municipal zoning authority with instructions to present for the chancellor's consideration, within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to the aggrieved landowner's parcel.

Specifically, upon the expiration of or within this 60-day period, the chancellor shall enter one of the following orders:

(i) If, after remand to the city council, plaintiffs and defendant city find the city's amendatory ordinance mutually acceptable, the chancellor shall order the implementation of such "midsatisfactory" amendatory ordinance.

(ii) If, after remand to the city council, defendant city submits an amendatory ordinance unacceptable to plaintiffs but embodying Justice BLACK's "midsatisfactory use"[1] as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of such "midsatisfactory" amendatory ordinance.

(iii) If, after remand to the city council, defen-

---

[1] See *Dequindre Development Co v Charter Twp of Warren,* 359 Mich 634; 103 NW2d 600 (1960) (separate opinion of Justice BLACK).

dant city submits an amendatory ordinance unacceptable to plaintiffs and plaintiffs submit a proposed use embodying Justice BLACK's "midsatisfactory use" as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of plaintiffs' proposed "midsatisfactory use".

(iv) If, after remand to the city council, neither plaintiffs nor defendant city can agree upon the other's amendatory ordinance or proposed use and the chancellor determines that neither party's proposal embodies Justice BLACK's "midsatisfactory use", the chancellor shall order the implementation of a "midsatisfactory use" after both plaintiffs and defendant city, as well as other affected parties, have had the benefit of a hearing and the submission of proofs to determine the most equitable or "midsatisfactory use" to be made of plaintiffs' parcel.

(v) If, after remand to the city council, defendant city does not submit an adopted amendatory ordinance to the chancellor, the chancellor is to conduct a hearing, supplemented by the submission of proofs by all affected parties, to determine and implement the most equitable or "midsatisfactory use" to be made of plaintiffs' parcel.

No costs. A public question being involved.

T. M. BURNS, J., concurred.

ALLEN, P.J. *(dissenting)*. While I respect, and in fact admire, the thoroughness in which the majority have reviewed this cause *de novo,* I am compelled to dissent. Reviewing the testimony with the same thoroughness, I cannot conclude that the A-1 and/or A-2 zoning classification, when applied to plaintiffs' 28-acre parcel, was unreasonable.

The gravamen of the majority's conclusion that

the zoning is unreasonable is that under such zoning the plaintiffs are unable to sell their lots at a profit. The trial court heard the testimony and did not agree. As was stated in *Ed Zaagman Inc v Kentwood,* 406 Mich 137, 153-154; 277 NW2d 475, 477 (1979), the ordinance comes clothed with every presumption of validity and it is up to the party contesting the ordinance to affirmatively prove its unreasonableness. Where the testimony on the question of the ordinance's unreasonableness is contested the court "is inclined to give considerable weight to the findings of the trial judge". The majority opinion, in effect, reverses the rule and is disinclined to give weight to the trial court's findings.

Based on my review of the record, I cannot conclude that the trial court erred. The lengthy references to the record cited by my brethren are equally offset by contrary testimony from defendants' witnesses. For example, Mr. Palmer, president of a building supply company, testified as follows:

"Q (By Mr. Forrest, continuing): Mr. Palmer, do you sell materials to builders?

"A Yes, Sir.

"Q What percentage of your build—of your business is directed towards selling to builders?

"A About forty percent.

"Q And how many builders do you deal with?

"A Total builders, about four hundred.

"Q Four hundred. Do you have any familiarity with the size and nature of the houses that these builders produce?

"A Yes, sir.

"Q And, are you familiar with those that build high quality homes and those that build the cheaper homes?

"A I am familiar with both.

"Q And, are you familiar with the extent to which both groups build?

"A Yes, sir.

"Q Are you familiar with whether or not these parties are building within the City of Flint or within the out-county area?

"A Yes, sir."

*   *   *

"Q (By Mr. Forrest, continuing): Do you have any idea, based upon your dealings with these builders, as to why high quality homes are not being built at present?

"A There is practically no high quality land available within the City limits of Flint. That is for sale.

"Q Are you familiar in the course of your business with the extent to which lots for high quality homes are available?

"A I'm familiar with the, the extent of areas, neighborhoods, and in a higher range of, of building and the more costly homes, there is very little land available for sale where a more expensive house can be built today.

"Q And would you have any knowledge as to where this area—where these areas are?

"A What little there is left in Flint would be, of course, in the Miller Road area, the Country Club area that we're now talking about, and there is some land available in the west side of Flint. But very spotty.

"Q Is there at present an area the size of the Schwartz parcel available for development in this direction?

"A Residential development, no, sir.

"Q Based upon your experience in this industry, what would be your opinion as to the salability of lots on the Schwartz parcel for these purposes if it were made available?

"A I believe they would be good.

"MR. CHILDS: I object, your Honor. He has no qualifications, background, basis as to the market value of lots in an A-1 or figures to site. Nothing.

"MR. FORREST: Well let me ask—

"THE COURT: Well—

"MR. CHILDS: That's beyond the canons of his experience.

"THE COURT: No, I am going to let him testify. Finally, I got somebody who knows what's going on today.

You know, we're talking about Mr. Schwartz, Mr. Childs. He hasn't even built a house or been in the building business. We have another man that you put on the stand here this morning that knows about Clio. He's been in some area. But nobody has even been on the stand yet that—until we got to Mr. Palmer—that knows what's going on, and these are questions that this Court wants to know. I want to know what land is available.

I understand from him for the first time that—you're telling me that this is—there's no other land other than —of this comparable size, Mr. Palmer.

"THE WITNESS: Your Honor, this is the last parcel of this size that is fit for residential construction within the city limits of Flint that quality homes could be built on. The last one, sir.

"Q (By Mr. Forrest, continuing): Mr. Palmer, are you familiar with the lot size requirements in A-1? Generally speaking?

"A Well, there's A, A and A-1. One is ten thousand square feet and one is five thousand square feet, but I—

"Q Okay. A-1 is ten thousand, A-2 is five thousand. If this area were to be available for ten thousand square foot lots, what would be your opinion as to the salability of these ten thousand square foot lots?

"MR. CHILDS: Continuing objection, your Honor.

"THE COURT: All right.

"A I believe that they would be good. There is a, a need for this type of property within the City. The City is requiring people to work for the City to move back into the City. There is a market for people that work for the school system, for the police department, to move back into the City. And a market for executive-type homes within the city limits of Flint. And they are fastly disappearing."

I further disagree with the majority on grounds that insufficient weight is given to the report of

the New York consulting firm which the city retained to study the area and advise on the proper zoning. That study recommended the zoning which the city council then adopted (A-1 residential with 10,000 square foot minimum) but which plaintiffs claim is unreasonable. In other words, the record shows the council did not act precipitously or unreasonably, but only after it had obtained expert advice.

I further disagree with the majority on grounds that *de novo* review discloses excellent reasons for not accepting plaintiffs' proposed B zoning, which would permit a mixture of residential uses including garden apartments and townhouses. The increased traffic likely from plaintiffs' proposed development would place a severe strain on the road system of the immediate area. This included the streets in defendants-intervenors' purely residential neighborhood. This area was developed without sidewalks, and hence pedestrians including school children would be endangered by the increased traffic flow. Also, the development suggested by plaintiffs would not be in conformity with the existing, adjacent subdivision of defendants-intervenors, and consequently their property would be adversely affected.

In sum, there are good reasons for the existing A-1 zoning classification, and the ordinance was certainly not arbitrary or capricious. The public is protected and the adjacent residents are protected by the zoning scheme. The independent study made by the New York firm reinforces this conclusion. Plaintiffs' arguments about the profitability of an A-1 development at best raise a close question. In light of the contrary testimony, the presumptions favoring a zoning ordinance, and the considerable weight we give to the trial court's findings, I cannot say that the ordinance as it now stands is not valid. I would affirm.