SCHWARTZ v CITY OF FLINT (AFTER REMAND)

Docket No. 55563. Submitted July 13, 1982, at Lansing.—Decided
   October 18, 1982. Leave to appeal applied for.

   Plaintiffs, Joseph and Lillian Schwartz, purchased a 28-acre
   parcel of land in defendant City of Flint, in 1966. At that time,
   the land was zoned A-2, which would permit single-family
   homes with a minimum lot size of 5,000 square feet. Thereafter,
   plaintiffs sought to have the property rezoned to C-1, which
   would permit multi-family homes and walk-up apartments. The
   request was denied. The plaintiffs thereafter commenced suit
   against the City of Flint in Genesee Circuit Court, claiming
   that the zoning ordinance was unreasonable as applied to the
   subject land. A number of nearby homeowners were permitted
   to intervene as defendants. Subsequently, the city rezoned the
   property from A-2 to A-1, which would permit single-family
   homes with a minimum lot size of 10,000 square feet. The
   court, Harry B. McAra, J., entered judgment for the defen-
   dants. The plaintiffs appealed and the Court of Appeals re-
   versed the circuit court, finding that, had it heard the testi-
   mony in the first instance, it would have been compelled to find
   the zoning arbitrary and unreasonable. Schwartz v Flint, 92
   Mich App 495; 285 NW2d 344 (1979), lv den 408 Mich 905
   (1980). The matter was remanded to the city zoning authority
   with instructions to present for the court's consideration,
   within 60 days, an adopted amendatory ordinance. The city was
   unable to develop an amendatory ordinance within the 60-day
   period. Thereafter, the city moved to extend the 60-day period,
   Genesee Circuit Court. The motion was denied and the court
   ordered a hearing on option (v) of the order of the Court of
   Appeals. Option (v) provides that, where the city does not
   submit an adopted amendatory ordinance to the chancellor, a
   hearing be conducted to determine and implement the most
   equitable or midsatisfactory use to be made of plaintiffs' land.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error §§ 703, 772, 882.
   82 Am Jur 2d, Zoning and Planning § 356.
[2] 82 Am Jur 2d, Zoning and Planning § 361.
[3] [No reference]

At the hearing, the plaintiffs introduced their exhibit 1, a map, representing their version of a compromise midsatisfactory use. The court, McAra, J., entered a declaratory judgment adopting plaintiffs' exhibit 1 as the midsatisfactory use but adding some substantial exceptions and modifications. The plaintiffs appealed, asking that the judgment be vacated and that their exhibit be adopted in its entirety without modification as the correct land use and claiming that option (v) unconstitutionally delegates the city's zoning function to circuit judges. *Held:*

1. Option (v) does not unconstitutionally delegate zoning to the circuit judge. The trial judge under option (v) is required to conduct a hearing to determine an equitable or midsatisfactory use of a parcel of land only after a finding that a zoning ordinance was invalid and that the zoning authority has been dilatory in adopting an amendatory ordinance. Rather than violating the separation of powers doctrine, option (v) is an exercise of the appellate court's powers of *de novo* review. Furthermore, because the Michigan Supreme Court has provided for the use of option (v), the Court of Appeals is bound by the doctrine of stare decisis.

2. The trial court's declaratory judgment establishing a midsatisfactory use of plaintiffs' property should be affirmed except the item providing that the second cluster should be zoned as duplexes. That item should be amended to include construction of single-family detached townhouses on land zoned A-2.

Affirmed in part, reversed in part and remanded with instructions.

1. APPEAL — EQUITY — *DE NOVO* REVIEW.

The Court of Appeals reviews on appeal the findings of a court of equity *de novo,* with due deference being given to the findings of the trial court; the Court of Appeals is required to sustain the findings of the court below unless it becomes convinced, upon review of the evidence, that had it heard the evidence in the first instance it would have been compelled to rule contrary to the ruling actually made by the trial court.

2. ZONING — EQUITY — REMEDIES.

If a zoning ordinance is declared to be invalid as applied to a plaintiff's property, the appropriate procedure is to enjoin the enforcement of the unconstitutional classification but to remand the matter to the appropriate zoning authority to present, for the chancellor's consideration within 60 days of the order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the require-

ments of constitutional reasonableness as applied to the aggrieved landowner's parcel; where the zoning authority has been dilatory in adopting an amendatory ordinance the chancellor is required to conduct a hearing to determine an equitable or midsatisfactory use of the property.

3. COURTS — COURT OF APPEALS — SUPREME COURT HOLDING.
   The Court of Appeals is powerless to overturn a Supreme Court holding.

*Robert E. Childs,* for plaintiffs.

*Patrick H. Hynes,* for City of Flint.

AFTER REMAND

Before: ALLEN, P.J., and CYNAR and R. B. MARTIN,* JJ.

ALLEN, P.J. In this cause we revisit *Schwartz v Flint,* 92 Mich App 495; 285 NW2d 344 (1979), *lv den* 408 Mich 905 (1980), one of the longest opinions ever to be released by this Court.[1] In that case, we struck down as unconstitutional a city ordinance which rezoned plaintiffs' 28-acre parcel of land A-1 single-family residential. The majority opinion held that the restrictions imposed by construction of A-1 zoned homes and the costs for construction precluded the property's use for any purpose for which it was reasonably adapted, and, as such, was an unconstitutional taking of property without just compensation. *Schwartz, supra,* p 503. The matter was remanded to the city zoning authority with instructions to present for the chancellor's consideration, within 60 days, an adopted amendatory ordinance.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] The opinion, including the dissenting opinion, is 47 pages in length.

Specifically, within the 60-day period, the chancellor was ordered to enter one of the following five orders:

"(i) If, after remand to the city council, plaintiffs and defendant city find the city's amendatory ordinance mutually acceptable, the chancellor shall order the implementation of such 'midsatisfactory' amendatory ordinance.

"(ii) If, after remand to the city council, defendant city submits an amendatory ordinance unacceptable to plaintiffs but embodying Justice BLACK's 'midsatisfactory use' as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of such 'midsatisfactory' amendatory ordinance.

"(iii) If, after remand to the city council, defendant city submits an amendatory ordinance unacceptable to plaintiffs and plaintiffs submit a proposed use embodying Justice BLACK's 'midsatisfactory use' as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of plaintiffs' proposed 'midsatisfactory use'.

"(iv) If, after the remand to the city council, neither plaintiffs nor defendant city can agree upon the other's amendatory ordinance or proposed use and the chancellor determines that neither party's proposal embodies Justice BLACK's 'midsatisfactory use', the chancellor shall order the implementation of a 'midsatisfactory use' after both plaintiffs and defendant city, as well as other affected parties, have had the benefit of a hearing and the submission of proofs to determine the most equitable or 'midsatisfactory use' to be made of plaintiffs' parcel.

"(v) If, after remand to the city council, defendant city does not submit an adopted amendatory ordinance to the chancellor, the chancellor is to conduct a hearing, supplemented by the submission of proofs by all affected parties, to determine and implement the most equitable or 'midsatisfactory use' to be made of plaintiffs' parcel." *Schwartz, supra,* pp 540-541.

Within the 60-day period, which expired June 24, 1980, the city was unable to develop an amendatory ordinance. Consequently, the city moved in circuit court to extend the 60-day period so that a proper ordinance could be formulated. Plaintiffs opposed the motion on the dual grounds that the ordinance was unconstitutional in that zoning was a legislative and not a judicial function, and the Court of Appeals rather than the circuit judge was the proper party to extend the 60-day period. Briefs were submitted and oral argument held on the motion on July 14, 1980. On January 19, 1981, plaintiffs' motion was denied and a hearing to be held on option (v) was ordered to commence on July 7, 1981.

On May 26, 1981, the planning commission met and discussed *Schwartz v Flint.* A formal vote was taken to recommend to the city council that the Schwartz property be zoned A-2 with a proposed community development project. The city council met on the same night but did not accept the recommendation of the planning commission. Instead, the council passed a more restrictive amendatory ordinance, to become effective June 28, 1981, requiring single-family detached dwellings north of the homes on the north side of Woodslea Drive, and to the rear thereof, or requiring a 100-foot green belt from the rear or north lot line boundaries of the houses facing Woodslea to the south or rear lot line of any type of multiple dwelling north of the 100-foot green belt.[2] The proposed ordinance was not confined to the

[2] As will be noted later in this opinion, the planning commission's recommendation did not restrict the construction of new units on the southern (first) tier of the Schwartz parcel to single-family detached houses but instead would allow a variety of units including garden type apartments, condominiums or single-family detached units. The ordinance enacted by the city council limited new units to single-family detached houses on A-1 zoned land.

Schwartz property alone but affected all vacant property of five acres or more in the City of Flint which was zoned either A-1 or A-2. Nevertheless, it appears that its enactment was in part a belated response to the Court of Appeals order for the enactment of a midsatisfactory use for the Schwartz property.

Hearings were held and testimony taken on option (v) on July 7 and 9, and on September 10 and 15, 1981. At the hearings, plaintiffs introduced their exhibit 1, a map representing plaintiffs' version of a compromise midsatisfactory use. Plaintiffs' original complaint in *Schwartz, supra,* proposed 258 apartment units. Exhibit 1 reduced that demand to 144 single-family units. Each unit would be a single-family attached townhouse (1,-700 square feet, 3 bedrooms, 2-1/2 baths) with an attached garage, selling for approximately $75,000 to $90,000. Seventy feet of open space was proposed between the most southerly townhouse to the most northerly home fronting on Woodslea Drive. Plaintiffs proposed to construct a curved entry in order to direct traffic toward Dort Highway and away from the existing subdivision to the south. Schwartz stated that the units were marketable and would attract "empty nesters", those individuals whose families have grown up and who desire luxury with minimum maintenance. As few families with young children would be attracted to the complex, there would be little adverse effect on the local school systems. Schwartz projected no adverse influence on the property values of surrounding property.

The most valuable portion of the subject property is its southern tier, as it has the highest elevation. It is also the portion generating the most controversy, the intervening property owners

insisting that it be zoned A-1 for single-family detached homes. In order to illustrate the economic infeasibility of building single-family detached homes in either A-1 or A-2 zoned areas, Schwartz discussed nearby homes that he had built during the 1960's. Two months before trial, a home at 2666 Pine Tree Drive was sold for $72,-000. Schwartz estimated that the house would cost approximately $119,000 to build in 1981. A home on 2617 Greenhill was sold for $90,000. Schwartz opined that the reproduction cost was $131,000. Schwartz stated that he could not build single-family detached homes on the southern tier of the subject property without achieving insolvency. Frank Moss, city assessor, testified that new homes exceeding $50,000 in price were being built and sold in A-1 and A-2 zoned areas. However, he admitted that most of the high price sales were resale of old homes rather than new construction.

Gerald Maes, a land planner and landscape architect, prepared plaintiffs' exhibit 1, entered on September 10, 1981. The proposed 144 two-story, attached townhouses, with attached garages were to be arranged in a series of clusters. Roadways, 30 feet from back curb to back curb, would wind among the clusters. Parking in excess of 2-1/2 cars per unit was planned. There would be approximately 110 feet from the front door of one townhouse to the townhouse directly across the street. Maes found a 100-foot buffer unnecessary, opining that a 35-foot space buffer was adequate. While the buffer zone would contribute open space to both the townhouse and subdivision dwellers, Maes believed that neither party needed such a large open area.

At the conclusion of the last day of testimony on November 15, 1981, Judge McAra issued a verbal

opinion from the bench. That opinion was reduced to a written judgment, dated and entered on November 23, 1981. The judgment, with attached map,[3] adopted plaintiffs' exhibit 1 as the midsatisfactory use with some substantial exceptions and modifications as follows:

"1. The 'emergency exit only' at the northwest corner of Greenhill and Woodslea Drive is prohibited;

"2. Plaintiff Schwartz must obtain the right-of-way to Terrace Drive over land zoned A-1, known as the 'Patsy parcel' and not owned by him;

"3. The third, fourth and fifth clusters moving from east to west will be zoned A-2 plus community development projects in the nature of single-family attached townhouse units (Tier 1);

"4. The land, or first cluster, immediately north of the single-family houses on Woodslea will be A-1 single-family detached dwellings (see attached map Tier 1 and description);

"5. The second cluster will be zoned as 'duplexes';

"6. The balance of the land (referred to in ¶ 3) shall be developed for townhouses in fee simple, having a square footage in the basement of 25 × 36, making 1700 square feet in the townhouses, with not more than 120 units with a possibility of adding four more units depending on ¶ 7;

"7. The flood plain level is established at 750 feet or whatever it is at the dam;

"8. Plaintiffs have the right to move dirt or fill but only with the permission of this court, the court retaining jurisdiction and permitting the DNR coming in to object;

"9. The maximum number of all units on the entire parcel is to 140."

From the declaratory judgment as so entered, plaintiffs appeal asking that the judgment be vacated and an order entered adopting plaintiffs'

---

[3] See map attached as an Appendix.

exhibit 1 in its entirety without modification as the correct land use.

The instant appeal for the first time presents for appellate review of a determination under option (v) by a trial court acting as "chancellor". We believe that the standards for review under option (v) are no different than the standards of review under option (1) as set forth in *Kirk v Tyrone Twp,* 398 Mich 429, 458; 247 NW2d 848 (1976), and quoted with approval by this Court in *Schwartz, supra.* In *Schwartz, supra,* pp 539-540, this Court said:

> "We review on appeal the findings of a court of equity *de novo,* with due deference being given to the findings of the trial court, *Barnett v International Tennis Corp,* 80 Mich App 396; 263 NW2d 908 (1978). This Court is required to sustain the findings of the court below unless it becomes convinced, upon review of the evidence, that had it heard the evidence in the first instance it would have been compelled to rule contrary to the ruling actually made by the trial court. *Salvador v Connor,* 87 Mich App 664; 276 NW2d 458 (1978), *lv den* 406 Mich 966 (1979)."

Application of the above standard of review presents no problems as to items, 1-3, 6, 7 and 9 of the declaratory judgment. The record contains substantial testimony concerning traffic, the narrowness of Woodslea Drive and the lack of sidewalks to justify the court's prohibition of the emergency exit only. Plaintiffs themselves proposed obtaining the right-of-way over the Patsy parcel. Item 3 contains the great majority of the land area on which the proposed townhouses would be built and item 6 permits construction of units of the type and size proposed by plaintiffs. Item 9 only reduced plaintiffs' proposed number of townhouses from 144 to 140. In other words, as to

the number of units, the land area on which the units would be placed and the design and size of the units, the plan adopted by the court substantially adopts the proposal set forth in exhibit 1. Clearly, as to these items, we would not have ruled differently had we heard the testimony in the first instance.

This leaves only the modifications set forth in items 4 and 5 as the subject matter for chancellor error. It is to these modifications that plaintiffs take exception. Speaking to these items at the hearing concerning the wording of the judgment, the trial court said:

"But what I tried to do is to look at it from both sides. The city wanted city—single-family dwellings; to have the court hold that its earlier opinion was correct, Mr. Childs wanted on behalf of Mr. Schwartz to go the other way and to have a hundred and forty-four units; townhouses. I, I felt no dilemma. Once I heard all the proofs it became very apparent to this Court, based on the facts that had been submitted to the Court, that there was room for all three different types of housing that the Court indicated; single-family, duplexes, so to speak, and the townhouses."

Attorney Childs argues that item 3 violates this Court's decision in *Schwartz, supra.* We disagree. When that case was first before us, the entire parcel was zoned A-1 single-family detached homes on land areas of 10,000 square feet. Given the costs of building homes on land areas of that size, this Court concluded that the zoning effectively prohibited use of the property for any purpose. We did not hold that *no part* of the property could be zoned A-1. Indeed, the chancellor might determine that single-family housing at the southern tier of the property might constitute a suitable buffer

zone between the homes on the north side of Woodslea Drive and the proposed area to the north thereof. However, we note that the area to the south of plaintiffs' parcel, including the area on which the five substantial homes on the north side of Woodslea Drive between Greenhill Lane and Pine Tree Drive are located (see attached map), is zoned A-2.[4]

Given the difficulty of selling newly constructed large homes, and the fact that the area to the south was zoned A-2, invites the question of whether the circuit court would have been better advised to have zoned the first cluster area A-2. After all, that was the recommendation of the 'planning commission, although it was not adopted by the city commission. We answer the question in the negative for several reasons. First, although the five homes on the north side of Woodslea Drive are on A-2 zoned property, the lots on which they stand are A-1 sized lots with one home occupying two lots. Their average lot width is more than 75 feet by 115 feet deep. A-2 zoning would allow minimum lot sizes (4,000 square feet) of as little as 40 feet by 100 feet. A-1 zoning (8,000 square feet) permits minimum lot sizes of 80 foot frontage and 100 foot depth. The latter is compatible with the lot sizes of the houses facing Woodslea Drive.

Second, the five beautiful homes referred to on the map on the north side of Woodslea Drive are built for lot sizes exceeding 10,000 feet. A-1 zoning as modified by the community development zoning ordinance enacted by the city council reduces the minimum lot dimensions to 8,000 feet, thus allow-

---

[4] A-2 zoning allows construction of single-family detached dwellings with a minimum lot size of 5,000 square feet. Under the city's community development project ordinance, the square footage for A-1 and A-2 lots may be reduced by 80%. Thus, lots in A-1 zoned areas may have a minimum lot size of 8,000 square feet and lots in A-2 zoned areas may have a minimum size of 4,000 square feet.

ing a smaller home. Given this fact together with the testimony of Frank Moss, city assessor, that some new homes exceeding $50,000 were being built and sold on A-1 zoned property within the city, we are not convinced that, had we been the trial judge, we would have acted differently.

However, we have difficulty sustaining the court's recommendation of "duplexes" as set forth in item 5. Here, the court was striving to create a second space-buffer of an additional 100 feet. The only evidence concerning duplexes came from witness Childers, and then only upon the suggestion of the court.

*"The Court:* Right. What has been your planning ' experience with duplex houses. Maybe that's the wrong word when I say duplex houses, but I think you know what I mean, where maybe just duplexes, maybe that's a better word for it.

*"The Witness:* There have been, I should say I guess within the City of Flint, very little duplex really built over the years, other than our old zoning ordinance. We get a few scattered in what were considered our single-family areas because our old zoning ordinance permitted two families if it was made to look like a single-family from the outside.

"So there were a number of scattered single-family lots in some of our older areas that have got duplexes built on them in that fashion.

"One area up on the northeast part of the city that actually is a new development built a considerable number in the Rolling Woods area. They built a number of duplexes in their original development.

*"The Court:* But that's another way in the way of use of land, is it not? *[sic]*

*"The Witness:* Yes."

Nevertheless, the court was sincerely trying to phase in the attached townhouse cluster units by creating something different between tier 1 and

tiers 3-5 (see map). The concept has merit, especially since the single-family proposed homes in tier 1 might sell better if they were not faced across the street by a wall of attached townhouses. Nevertheless, the duplex concept has almost no support in the record. Rather than striking item 5 in its entirety and replacing it with the units shown on plaintiffs' exhibit 1, we have an alternate suggestion. We suggest that tier 2 be left as it is but be expanded by permitting detached townhouses to be constructed thereon. A detached single-family townhouse is not much different in aesthetic appearance than a single-family detached home.

Though the judgment and map do not show the proposed zoning for duplexes, the transcript of the hearing November 23, 1981, discloses that the requisite zoning is A-2. Thus, under our recommendation the circuit court's judgment as to tier 2 would be changed to permit either duplexes or detached townhouses on A-2 zoned property, or both. As so changed, the plaintiffs would have a choice of building duplexes or detached townhouses. In all other respects, the declaratory judgment of the trial court is affirmed and the judge commended for the thoroughness and general excellence of the first-impression task to which he was assigned.

One other issue raised by plaintiff must be addressed. Prior to arguing that based on the merits plaintiffs' exhibit 1 should be declared the midsatisfactory use, plaintiffs raise the threshold claim that option (v), as enunciated in *Zaagman, Inc v City of Kentwood,* 406 Mich 137; 277 NW2d 475 (1979), and applied in *Schwartz v Flint,* 92 Mich App 495; 285 NW2d 344 (1979), *lv den* 408 Mich 905 (1980), is unconstitutional. According to plain-

tiffs, option (v) unconstitutionally delegates the city's legislative function, *i.e.,* zoning, to circuit judges. We are not persuaded.

Under option (v), the circuit court does not sit as a super-zoning commission. Instead, the circuit judge is required to conduct a hearing to determine an equitable or midsatisfactory use of a parcel of land. The hearing is required only after a finding that a zoning ordinance is invalid and the city council has been dilatory in adopting an amendatory ordinance. Rather than violating the separation of powers doctrine, option (v) is an exercise of the appellate court's powers of *de novo* review. See generally *Daraban v Redford Twp,* 383 Mich 497; 176 NW2d 598 (1970). Indeed, the balancing-of-equities approach ensures the orderly and equitable development of communities, provides affected parties with a competent, disinterested, and reflective forum for the resolution of land use grievances, while simultaneously affording the legislative branch considerable deference. *Zaagman, supra,* p 181.

In any event, the Court of Appeals is bound by the doctrine of stare decisis. *Hutson v Royal Oak,* 28 Mich App 393, 395; 184 NW2d 558 (1970). Thus, even if this Court disagrees—and we do not—it is powerless to overturn a decision of the Michigan Supreme Court. See *People v Recorder's Court Judge #2,* 73 Mich App 156, 162; 250 NW2d 812 (1977).

The circuit court's declaratory judgment, establishing a midsatisfactory use of plaintiffs' property, is affirmed except item 5 thereof. That part of the judgment is amended to include construction of single-family detached townhouses on land zoned A-2. As so amended, the matter is remanded to the circuit court with instruction to enter an order

consistent with this opinion. Plaintiffs will be responsible for submitting a development plan as amended by this Court to the appropriate local authorities for final approval.

No costs, neither party having prevailed in full and a question of public interest being involved.

APPENDIX