MOWERY v CRITTENTON HOSPITAL

Docket No. 85049. Submitted June 17, 1986, at Lansing. Decided
August 26, 1986.

Plaintiffs Bonnie Mowery and Richard Mowery brought an action
in the Oakland Circuit Court against Crittenton Hospital, Rose
Malach, M.D., Ayerst Laboratories, Inc., and American Home
Products, Inc., alleging negligence in regard to the prescribing
of the drug Phospholine Iodide to Bonnie Mowery. Ayerst and
American Home Products moved for summary judgment on the
ground that they did in fact adequately warn the treating
physician, Dr. Malach, of the risks associated with the use of
the drug. The trial court, Hilda R. Gage, J., granted a summary
judgment to Ayerst and American Home Products on grounds
that there was no question of fact but that Dr. Malach had
been adequately warned of the drug's risks and that, even if
the testing of the drug by Ayerst and American Home Products
had been inadequate, it was not the cause of Bonnie Mowery's
injury. Plaintiffs appealed raising the issues of whether a drug
manufacturer has a duty to warn the ultimate consumer of the
product's danger and whether the trial court erred in finding
that Ayerst and American Home Products' alleged failure to
adequately test the drug product was not the proximate cause
of Bonnie Mowery's injury. The Court of Appeals denied defen-
dants Ayerst and American Home Products' motion to dismiss
the appeal and the Supreme Court also denied their application
for leave to appeal to the Supreme Court. 424 Mich 861 (1985).
The Court of Appeals *held:*

REFERENCES

Am Jur 2d, Appeal and Error §§ 727, 853.

Am Jur 2d, Products Liability § 328.

Am Jur 2d, Torts §§ 26 *et seq.*

Liability of manufacturer or seller for injury or death allegedly
caused by failure to warn regarding danger in use of vaccine or
prescription drug. 94 ALR3d 748.

Modern status of views as to general measure of physician's duty to
inform patient of risks of proposed treatment. 88 ALR3d 1008.

See also the annotations in the Index to Annotations under Appeal
and Error.

1. The trial court allowed a sufficient period of time for discovery and a sufficient amount of discovery occurred.

2. A prescription drug manufacturer does not have the duty to directly warn the consumer of a drug's risks. In the absence of a clear legal duty imposed upon the defendant manufacturers, Ayerst and American Home Products, to directly warn Bonnie Mowery, plaintiffs have failed to state a claim upon which they may recover.

3. The Court of Appeals agreed with the trial court's finding that even if Dr. Malach had been given additional warnings about the drug the doctor still would have chosen to prescribe the drug and, therefore, the alleged lack of warnings was not the proximate cause of Bonnie Mowery's injury.

Affirmed.

1. APPEAL — SUMMARY JUDGMENT — DISCOVERY.

The standard of review applicable to a claim that summary judgment was improperly granted as discovery had not yet been completed is whether further discovery stands a fair chance of uncovering factual support for the opposing party's position.

2. CONSUMER PROTECTION — PRESCRIPTION DRUGS — WARNINGS OF RISKS.

A prescription drug manufacturer does not have a duty to directly warn the consumer of the drug of the drug's risks.

3. TORTS — PROXIMATE CAUSE — PRESCRIPTION DRUGS — WARNINGS OF RISKS.

An alleged lack of warnings by a prescription drug manufacturer to a doctor who prescribes the drug regarding certain risks incident to the use of the drug may be found not to be a proximate cause of an injury received by the doctor's patient as a result of the use of the drug where the evidence indicates that, even if the doctor had been given additional warnings by the manufacturer, the doctor still would have chosen to prescribe the drug.

*James Leonard Elsman,* for plaintiffs.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Michael L. Updike*), for Ayerst Laboratories, Inc., and American Home Products, Inc.

Before: ALLEN, P.J., and WAHLS and M. WAR-
SHAWSKY,* JJ.

PER CURIAM. On June 27 and August 6, 1985,
the circuit court for Oakland County, pursuant to
GCR 1963, 117.2(1) and (3), entered orders of sum-
mary judgment in favor of defendants Ayerst Lab-
oratories, Inc., and American Home Products, Inc.,
as to the issues of defendants' failure to test their
drug product, Phospholine Iodide, and failure to
warn plaintiffs of its dangers. Plaintiffs appeal as
of right raising two issues: (1) whether a drug
manufacturer has the duty to warn the ultimate
consumer of the product's dangers; and (2)
whether the trial court erred in finding that defen-
dants' alleged failure to adequately test the drug
product was not the proximate cause of plaintiff's
injury.[1]

On August 26, 1981, at Crittenton Hospital,
codefendant Dr. Rose Malach performed a cataract
removal and implantation of an intraocular lens
on plaintiff Bonnie Mowery's right eye. The proce-
dure involved the removal of the eye's natural lens
which has an opaque covering or a cataract and its
replacement with an artificial lens. Preoperatively,
Dr. Malach explained to plaintiffs this surgical
procedure's known risks of detachment of the
retina, the portion of the eye containing the rods
and cones, which transmits images to the optic
nerve allowing vision. Plaintiff Bonnie Mowery
signed a consent form acknowledging her aware-
ness of all of the risks of cataract surgery.

Postoperatively, on September 10, 1981, Dr. Ma-
lach discovered a detachment of the lower loop
keeping plaintiff's intraocular lens in place. Dr.

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] Hereinafter, "plaintiff" refers to Bonnie Mowery. "Plaintiffs" re-
fers to both Bonnie and Richard Mowery.

Malach explained to plaintiffs what was wrong and how she planned to correct it and prescribed an eye drop, Phospholine Iodide, an opthamologic therapeutic drug. In prescribing the drug, Dr. Malach verbally explained to plaintiffs the drug's risks, which were retinal detachment and complications with certain types of general anesthesia. She *did not* give them any written information from the manufacturer, defendant Ayerst Laboratories.

Despite the risks of retinal detachment with the use of Phospholine Iodide, Dr. Malach prescribed this eye medication because it could prevent dislocation of the intraocular lens. Such dislocation could damage the cornea's endothelium (the outer covering of the eye), which would require a corneal transplant.

Because plaintiff's intraocular implant lens was again dislocated on October 23, 1981, Dr. Malach discontinued the Phospholine Iodide. After several unsuccessful attempts to medically reposition the lens, Dr. Malach successfully surgically repositioned it. Phospholine Iodide was again used during that procedure. On November 13, 1981, plaintiff contacted Dr. Malach's office complaining of a change of vision in her right eye. Because Dr. Malach was ill, plaintiff sought treatment from Dr. Aragones, who diagnosed retinal detachment. Surgery was performed to correct this detachment. However, plaintiff claims that she has suffered "permanent or protracted vision loss."

On September 14, 1983, plaintiffs filed a complaint against Crittenton Hospital, Dr. Malach, and Ayerst Laboratories, Inc., alleging negligence for the failure to adequately test or warn. On October 20, 1983, plaintiffs filed an amended complaint adding American Home Products, Inc., as a defendant and alleging that both Ayerst and

American (1) breached their express or implied warranty and were strictly liable because the drug Phospholine Iodide is defective, and (2) consciously misrepresented the safety of its product, a proximate cause of plaintiff's injuries. Following the taking of depositions, Ayerst and American moved on June 13, 1984, for summary judgment on grounds they did in fact adequately warn the treating physician of the risks of retinal detachment. On June 27, 1984, the trial court granted partial summary judgment on grounds there was no question of fact but that Dr. Malach had been adequately warned of the drug's risks. However, the trial court held that the motion for summary judgment regarding adequate testing was denied without prejudice.

On July 3, 1984, defendants[2] filed a supplemental motion for summary judgment pursuant to GCR 1963, 117.2(1) and (3) regarding defendants' adequate testing of Phospholine Iodide. Defendants submitted an affidavit by Robert Lehman, Ph.D., who was the pharmacist primarily responsible for supervising the research and development of Phospholine Iodide (generic name: Echothiophate Iodide). Dr. Lehman claimed that extensive animal testing was done with this drug, during which retinal detachment was never observed. Phospholine Iodide was approved by the Food and Drug Administration in 1959.

On July 13, 1984, plaintiffs submitted the affidavit of David Schneider, Ph.D., stating that he had reviewed the literature relating to this drug. Dr. Schneider believed that the warnings and package inserts given to physicians by defendants do not adequately set forth the specific danger of retinal detachment associated with this drug. Independent

---

[2] Hereinafter the word "defendants" refers to Ayerst Laboratories, Inc., and American Home Products, Inc.

published research states the link between Phospholine Iodide and retinal detachment.

On July 25, 1984, the trial court granted defendants' supplemental motion for summary judgment after finding that even if defendants' testing of Phospholine Iodide was inadequate, it was not the proximate cause of plaintiff's injury. While adequate testing would have allowed defendants to effectively warn plaintiffs and the treating physician of the risks of retinal detachment, Dr. Malach already knew of its risks, but chose to prescribe the drug and informed plaintiffs of the risks.

Following the filing of plaintiffs' claim for appeal as of right to this Court, defendants moved to dismiss the appeal. Defendants' motion was denied on July 26, 1985. On December 17, 1985, defendants' application for leave to appeal to the Michigan Supreme Court was also denied as the Court was "not persuaded that the question presented should be reviewed by this Court." 424 Mich 861 (1985).

I

At the outset, plaintiffs contend that summary judgment was inappropriate as discovery was not yet complete. On this issue the standard of review is whether further discovery stands a fair chance of uncovering factual support for the opposing party's position. *Goldman v Loubella Extendables,* 91 Mich App 212, 218; 283 NW2d 695 (1979), lv den 407 Mich 901 (1979); *Huff v Ford Motor Co,* 127 Mich App 287, 296; 338 NW2d 387 (1983); *Kortas v Thunderbowl & Lounge,* 120 Mich App 84, 87; 327 NW2d 401 (1982). Here, plaintiffs filed their complaint approximately ten months before summary judgment was granted. Six depositions were taken and numerous interrogatories were

answered by all parties. In light of Dr. Malach's and Bonnie Mowery's deposition testimony, we find that a sufficient period of time and sufficient amount of discovery occurred. It does not appear that further discovery will uncover factual support for either party's position.

On the substantive issue of a drug manufacturer's duty to warn, plaintiffs urge this Court to close the void in Michigan law created by the majority opinion in *In re Certified Questions,* 419 Mich 686; 358 NW2d 873 (1984), by issuing an opinion requiring that a prescription drug manufacturer has the duty to directly warn *the consumer* of the drug's risks. We respectfully decline the invitation.

In 1979, our Supreme Court in *Smith v E R Squibb & Sons, Inc,* 405 Mich 79, 88-89; 273 NW2d 476 (1979), stated:

> A manufacturer of a prescription drug has a legal duty to warn the medical profession, not the patient, of any risks inherent in the use of the drug which the manufacturer knows or should know to exist. *McEwen v Ortho Pharmaceutical Corp,* 270 Or 375; 528 P2d 522 (1974); *Sterling Drug, Inc v Yarrow,* 408 F2d 978, 993 (CA 8, 1969); *Love v Wolf,* 226 Cal App 2d 378, 395; 38 Cal Rptr 183, 192-193 (1964). However, this duty has been held to require warnings to the patient when the prescription drug is administered in a mass immunization program. *E.g., Davis v Wyeth Laboratories, Inc,* 399 F2d 121 (CA 9, 1968). Determination of whether this duty has been breached in the context of a negligence claim necessitates that the warnings given be examined as to their reasonableness under the circumstances.

Between 1979 and 1984 the Supreme Court's holding in *Smith* that a drug manufacturer's duty to warn does not extend to the patient was fol-

lowed in several decisions of the Court of Appeals. *Reeder v Hammond,* 125 Mich App 223, 226; 336 NW2d 3 (1983); *Taylor v Wyeth Laboratories, Inc,* 139 Mich App 389, 397; 362 NW2d 293 (1984), lv den 423 Mich 852 (1985); *Dunn v Lederle Laboratories,* 121 Mich App 73, 79; 328 NW2d 576 (1982), lv den 417 Mich 1098 (1983); *Muilenberg v Upjohn Co,* 115 Mich App 316, 332; 320 NW2d 358 (1982); *Formella v Ciba-Geigy Corp,* 100 Mich App 649; 300 NW2d 356 (1980), lv den 411 Mich 995 (1981). However, Justice LEVIN in the Supreme Court's majority opinion, *In re Certified Questions, supra,* p 697, stated that the Court's prior statement in *Smith, supra,* was dictum and, therefore, did not establish a rule of law.

> The allocation of the duty to warn patients is a public policy question involving the marketing system and economics of a major industry and the everyday practice of an essential profession. We believe that the Legislature is in a better position to allocate those duties. [*In re Certified Questions, supra,* p 691-692.]

In a strong dissent, Justice BOYLE, joined by Chief Justice WILLIAMS and Justice BRICKLEY, distinguished the duty owed by a drug manufacturer of oral contraceptives and that owed by a manufacturer of a "therapeutic, diagnostic, or curative prescription drug." Justice BOYLE explained that the "learned intermediary" doctrine is an exception to the axiomatic principle that a manufacturer has a duty to warn the user of known dangers inherent to its product. This exception is applied to manufacturers of prescription drugs, who are required to warn only the prescribing physician, who acts as a "learned intermediary" between the manufacturer and consumer. 419 Mich p 704.

The exception has also been justified by an assertion that direct manufacturer-consumer communication is difficult if not virtually impossible. *Terhune, supra,* p 14; *Carmichael v Reitz,* 17 Cal App 3d 958, 988-989; 95 Cal Rptr 381 (1971).

In addition, it has been argued that a duty to warn the user directly would cause undue interference with the relationship between doctor and patient. *Dunkin v Syntex Laboratories, Inc,* 443 F Supp 121, 123 (WD Tenn, 1977); *Carmichael, supra,* p 988.

"Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative." *Reyes v Wyeth Laboratories,* 498 F2d 1264, 1276 (CA 5, 1974) [cert den 419 US 1096 (1974). 419 Mich p 707.]

The "learned intermediary" doctrine has been adopted by many other jurisdictions, where it has almost unanimously been applied for all prescription drugs, including oral contraceptives.[3] Justice BOYLE concluded that while the "learned intermediary" doctrine should not apply to oral contraceptives because women may obtain a refill without repeated medical assessment, it should apply to cases involving prescription drugs.

In such a context, it is true that the patient relies almost completely on the skill and judgment of the physician in selecting an appropriate drug for the treatment of the patient's illness or injury. A warning to the patient under these circum-

---

[3] See 419 Mich pp 704-705 for a lengthy list of cases from other jurisdictions.

stances could potentially cause undue interference with the doctor-patient relationship, cause patient confusion, and result in a hampering of the healing process. To this extent, the rationale for the learned intermediary doctrine supports a duty to warn only the prescribing physician." 419 Mich pp 709-710.]

This panel's declination to "close the gap" or otherwise change the law regarding a drug manufacturer's duty to warn in accordance with plaintiffs' request is posited on two grounds. First, since the Supreme Court has ruled that this is a matter for the Legislature rather than the courts, we decline at this time to act contra to the Supreme Court and make this a judicial matter. While we may not agree with Supreme Court decisions, we must respect and follow them. *Schwartz v City of Flint (After Remand),* 120 Mich App 449, 462; 329 NW2d 26 (1982); *Ratliff v General Motors Corp,* 127 Mich App 410, 416; 339 NW2d 196 (1983).

Second, public policy supports the result reached below. Phospholine Iodide, unlike the contraceptive pills in *In re Certified Questions, supra,* or *Odgers v Ortho Pharmaceutical Corp,* 609 F Supp 867 (ED Mich, 1985), is not a "consumer demand" of "mass consumption" type drug. It is purchasable legally in the United States only with a valid prescription issued by a doctor. To expect the average citizen to know if he or she should take the drug or when to stop taking it, or to understand the technical language so often necessary to explain the dangers of the drug, is unreasonable. This is the basis for the "learned intermediary" rule adopted by a majority of jurisdictions in cases involving therapeutic, diagnostic or curative drugs.

Accordingly, in the absence of a clear legal duty imposed on defendant manufacturers to directly warn plaintiffs, plaintiffs have failed to state a

claim upon which they may recover, GCR 1963, 117.2(1), now MCR 2.116(C)(8).

II

It was also plaintiffs' theory of liability that defendants failed to adequately test the drug and, because of such inadequate testing, defendants were unable to sufficiently warn Dr. Malach of Phospholine Iodide's risks. On this issue, as noted earlier, the trial court found that even if defendants had completed adequate testing, enabling them to effectively warn Dr. Malach of the danger of retinal detachment, the lack of such a warning was not the proximate cause of plaintiff's injury. Dr. Malach testified that she was aware of the association of retinal detachment with this drug from reading the opthamologic literature. She informed plaintiffs of this risk. Despite her knowledge that this drug could cause retinal detachment, Dr. Malach chose to prescribe this drug for plaintiff. She stated that it was worth taking the "risks" to avoid repeated intraocular lens dislocation, endangering plaintiff's cornea.

Thus, it appears that even if Dr. Malach had been given additional warnings by defendants of the risk of retinal detachment, she would have chosen to prescribe Phospholine Iodide for plaintiff. There is no evidence that she would have done otherwise.

Plaintiffs also argue that further discovery may have allowed them to establish proof that Dr. Malach possibly would have made another drug choice or to raise any other question of fact. Two months before the second summary judgment motion was heard on the adequacy of defendant's testing of this product, plaintiffs' counsel deposed Dr. Malach and asked, inter alia, why she decided

to use Phospholine Iodide with the knowledge that it could cause retinal detachment. Dr. Malach responded that she was warned of the specific risks of retinal detachment, but by sources other than the defendants. Based upon this testimony, we do not believe that further warnings would have led Dr. Malach to have prescribed any differently, even if defendants themselves had warned her of the risks about which she already knew. Accordingly, we find no error on this issue.

Affirmed.