Chris NICHOLS, Personal Representative of the Estate of Twila Ann Nichols, Deceased, Plaintiff,

v.

McNEILAB, INC., a foreign corporation; McNeilab, Inc., d/b/a McNeil Pharmaceutical; and McNeil Consumer Products Company, a foreign corporation; jointly and severally, Defendants.

Civ. A. No. 87–CV–40380–FL.

United States District Court, E.D. Michigan, Southern Division, Flint.

Oct. 13, 1993.

Richard M. Goodman, Goodman Lister Seikaly & Peters P.C., and Carole F. Youngblood, Williams & Youngblood, P.C., Detroit, MI, for plaintiff.

Elizabeth N. McKenna, Honigman Miller Schwartz & Cohn, Detroit MI and William Cavanaugh, Jr., New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Before the Court is defendants' motion for summary judgment (D.E.# 235), plaintiff's response, and defendants' reply. For the reasons that follow, defendants' motion is DENIED.

This wrongful death action arises out of the death of Twila Ann Nichols ("decedent") on December 21, 1984. Plaintiff alleges that the cause of decedent's death was a severe anaphylactic reaction to the ingestion of Zomax, a prescription drug manufactured and marketed by defendants. Through their motion, defendants seek summary judgment on plaintiff's claim against defendants for breach of a duty to adequately warn Zomax consumers of the drug's withdrawal from the market due to possible anaphylactic reactions to its use by some patients. Defendants contend that pursuant to the "learned intermediary rule," defendants complied with any duty they had to warn decedent by warning prescribing physicians of the dangers of the drug and of its withdrawal from the market in March 1983, and recommending that those physicians direct their patients to discontinue use of the drug. While the parties dispute the means and sufficiency of the warnings given to physicians and the adequacy of any warning to consumers via press releases publicizing the drug's withdrawal, neither the means used nor the adequacy of the warnings are relevant to resolution of defendants' motion.[1] The sole question posed by defendants' motion for summary judgment is whether defendants' actions were sufficient to discharge their duty to warn as a matter of law. The Court, after great consideration, finds that they were not.

### Facts and Procedural History

The relevant facts of this case have been set forth in both the Magistrate Judge's Report and Recommendation of June 6, 1990 (D.E. # 107), and a Report and Recommendation ("R & R") filed September 30, 1992 (D.E. # 224). The relevant portions of these R & Rs have been adopted as the opinion of this Court. Therefore, it is unnecessary to repeat the facts; rather, the Court hereby incorporates by reference the fact pattern as recounted in the above-mentioned R & Rs.

In addition to setting forth a detailed factual description regarding this matter, in his R & R of June 6, 1990 the Magistrate Judge addressed defendants' motion, which argued that, *inter alia,* defendants satisfied their duty to warn by notifying physicians generally about the risks attendant with Zomax use and withdrawing the drug from the market in a highly publicized manner. The Magistrate Judge analyzed the law in this area, and recommended denial of defendants' motion as to this claim because of the parties' failure "to discuss whether a manufacturer of a product ... has an enhanced duty to warn the consuming public directly of its product's dangers once it finds it necessary to withdraw that product from the market." June 6, 1990 R & R at 15. The Magistrate Judge recommended denial of defendants' motion without prejudice, inviting defendants to re-address the duty to warn issues. *Id.* at 17. As noted above, the Court accepted the Magistrate Judge's R & R, thus leaving open the door to defendants' present motion for summary judgment. Unfortunately for defendants, they have failed to cite additional case law in support of their contention that their duty to warn was discharged pursuant to the learned intermediary doctrine. Moreover,

---

1. The reasonableness of defendants' actions is a question requiring jury resolution.

their arguments directed toward the issue are unpersuasive.

## Discussion

At the outset, the Court further refers the parties to the Magistrate Judge's discussion and analysis regarding the learned intermediary doctrine as it is set forth in the June 6, 1990 R & R at pages twelve through sixteen. The Court finds this discussion applicable to defendants' present motion and, to the extent applicable, the Court adopts that reasoning herein. In the motion now before the Court, defendants add little to their argument as addressed and disposed of by the June 6, 1990 R & R. To the extent that defendants do expand their argument on the issue, the Court finds it unpersuasive. Accordingly, summary judgment is again denied at this time.

Instead of providing further case law in support of their position, defendants argue that "[n]o court has ever imposed a duty to warn patients directly because the nature of the warning was an explicit directive to discontinue use of a prescription drug." Defendants' motion brief at 10. Defendants argue that because decedent's physicians had been informed, decedent's failure to indicate to those physicians that she was taking Zomax entitles defendants to summary judgment. Defendants reason that the learned intermediary doctrine would have prevented decedent's death but for her negligent behavior. This assertion, however, provides support not for summary judgment, but rather for the defense of comparative negligence that may be argued to a jury. Upon the facts of this case, the Court finds the learned intermediary doctrine inapplicable.

■ The learned intermediary doctrine is an exception carved out of the general rule that it is a manufacturer's duty to warn its product's users of dangers known to be inherent in the product. As applied to prescription drugs, the doctrine shifts the manufacturer's duty from requiring a warning directly to the consumer/patient to requiring that a warning be communicated to the physician, who is in a better position to weigh the risks and benefits of the use of the drug. The rationale behind the doctrine is that, in making the determination as to whether the treatment of a patient should include the prescription of a manufacturer's drug, the physician, acting as a learned intermediary, is in a better position not only to weigh the risks and benefits of the particular drug for the particular patient, but also to explain these risks and benefits to the patient herself. The presumption is that use of the learned intermediary to convey the necessary warnings and recommendations is more effective and safe than would be any communication directly between a manufacturer and the consumer. While this doctrine holds true for the *prescription* of prescription drugs, to which the consumer has no access except through her physician, it is questionable whether this approach reasonably and adequately provides notice to a consumer of the recall or withdrawal of a prescription drug that is used on an intermittent basis by the consumer.[2]

■ This is the very point made by the Magistrate Judge in his June 6, 1990 R & R, and is the issue in support of which defendants were invited to provide additional law and argument. Instead of citing additional case law in support of their position, defendants have merely argued that there is no distinction between the facts of this case—the withdrawal of a prescription drug from the market—and the classic case—in which the physician makes a decision as to whether a patient's treatment requires prescription of a certain drug and gives instructions as to its use to the patient. The Court, as did the Magistrate Judge, does see a distinction, and finds that reliance upon a warning to a learned intermediary in this case may not discharge defendants' duty to adequately warn as a matter of law.

It may well be that a jury will find this warning reasonably sufficient in this case. It is also possible that a jury will find defendants' release to the media of this information—or the combination of the two—to have

---

2. The question of reasonableness, of course, is dependent upon whether such intermittent use is foreseeable.

been a proper discharge of their duty. Nevertheless, as the determination of whether use of the drug should be discontinued was made with regard to virtually every consumer [3] by the manufacturer itself, the duty of the manufacturer would have been at least as efficiently and effectively communicated directly to the consumer, or the general public, probably in some combination with a warning to physicians who would be able to warn a majority of the drug's consumers.

Plaintiff's claim herein provides a vivid example of the inadequacy of a warning only to physicians in the case of a withdrawal of a prescription drug from the market. The Court takes judicial notice of the fact that many persons—if not most—do not dispose of prescription drugs after the condition for which they were prescribed has been relieved. Moreover, should the symptoms reoccur, many persons, in lieu of a visit to the doctor, simply treat themselves by utilizing the remainder of the often expired prescription medication with which they were successfully treated on a previous occasion. Thus, in a withdrawal of a particular prescription drug it is foreseeable that a warning to physicians only will not reach every consumer of that product.

■ Similarly, reliance upon physicians to contact all patients for which a certain drug has been previously prescribed is both unduly burdensome upon the physician and potentially inadequate. In this case, the decedent was prescribed Zomax by an emergency room physician. Even with the best record-keeping system, what a burden it would be for an emergency room to contact all patients who previously were prescribed Zomax. Moreover, reliance upon the learned intermediary doctrine would not provide any warning to patients in a situation where a doctor's records have been destroyed by fire or flood, or if the doctor herself has died since prescribing the withdrawn medication. Certainly a majority of patients who have been prescribed a drug will have follow up contact with the prescribing physician and, thereby, will receive the necessary warning. Nevertheless, the manufacturer has a duty to warn

by means that are reasonably calculated to reach all consumers of their defective product. While the Court does not hold that the warnings sent by defendants in this case were not reasonable or adequate as a matter of law, the Court does hold that the learned intermediary doctrine does not apply where a manufacturer of a prescription drug that previously has marketed its product for intermittent use withdraws its product from the market wholesale. The Court refuses to grant summary judgment upon the facts of this case.

## Disposition

■ For the foregoing reasons, defendants' motion for summary judgment is DENIED. The adequacy of the warnings provided by defendants is an issue to be resolved at trial. Moreover, whether decedent's use of Zomax after an apparent allergic reaction or decedent's failure to indicate to her physicians her use of the prescription drug constituted negligence on her part is a question of comparative negligence to be determined by a jury.

## Discovery

The parties have indicated by letter to the Court that there is additional expert discovery remaining to be conducted before this case is ready for trial. All discovery shall be completed within sixty days of the date hereof. A Final Pretrial Conference shall be set by the Court for mid-December. The parties shall prepare a Joint Final Pretrial Statement as provided for in the Court's Policies (attached) and submit it to the Court no later than five days prior to the Final Pretrial Conference Date.

SO ORDERED.

## MAGISTRATE'S REPORT AND RECOMMENDATION

GOLDMAN, United States Magistrate Judge.

---

**3.** Although defendants note that Zomax was still available for use in certain specific cases, there is no dispute that the prescription of Zomax for treatment of premenstrual cramps—as was the decedent's use in this case—was not one of the exceptional applications for which Zomax was still available.

## I.

### FACTS

This is a wrongful death action[1] by the personal representative of Twila Ann Nichols, a 37–year old woman who died on December 21, 1984 after allegedly taking a Zomax[2] tablet for menstrual pain. It is alleged that plaintiff suffered a fatal allergic reaction from the Zomax tablet. Plaintiff contends that Twila Nichols' death was the proximate result of defendants' failure to adequately warn prescribing physicians and the consuming public of the risks associated with the intermittent use of Zomax.

The defendants, McNeil Pharmaceutical Company and McNeil Products Company [collectively referred to as "McNeil"], answer by contending 1) that there is no direct evidence that Twila Nichols ingested a Zomax tablet and 2) that McNeil satisfied its duty to warn physicians about the risks attendant with Zomax use and, furthermore, that it provided the "ultimate warning" by withdrawing the product from the market in 1983, before Ms. Nichols' death. McNeil has filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56(b), alleging that there is insufficient evidence to establish that Zomax was the cause in fact of Ms. Nichols' death and further, that McNeil did not breach its duty to warn, which it contends ran only to prescribing physicians.

The evidence supporting the conclusion that Ms. Nichols ingested Zomax on the morning of her death is entirely circumstantial. On December 15, 1982, approximately two years before her death, the medical records from the emergency room of Lapeer County General Hospital reveal that Twila Nichols was prescribed Zomax for severe menstrual cramps.[3] Medical records also indicate that over the next two years, Ms. Nichols was prescribed other pain relievers, but available pharmacy records establish that only the Zomax and some penicillin-type prescriptions were ever filled and actually purchased by Ms. Nichols.

Deposition testimony of Budwea Traver, Ms. Nichols' sister, indicates that on the evening before her death, Ms. Nichols complained of severe cramps and was concerned about whether she would feel well enough to attend a graduation ceremony for Ms. Traver's daughter the next day. Ms. Traver stated that in the early morning of December 21, 1985, she received a hysterical telephone call from Ms. Nichols' thirteen year old daughter who had found her mother lying face down on the floor of her trailer home. Ms. Traver drove immediately to the Nichols' residence. While she was attending to her sister, Ms. Traver stated that she noticed a prescription bottle on the bathroom counter. Ms. Traver testified that she did not know whether or not the bottle contained a prescription for Zomax, but merely remembered seeing a prescription bottle while looking from the hall into the bathroom. Sometime within four weeks after Ms. Nichols' death, Ms. Traver and the decedent's son, Chris Nichols, found a bottle of Zomax in the medicine cabinet of the trailer home. Although defendant contends that the search followed a visit to their attorney's office and that the two looked only for Zomax, Ms. Traver and Chris Nichols have stated that the Zomax was the only prescription bottle they found. In addition, Chris Nichols found no other prescriptions when he packed up the family's belongings and moved out of the trailer about one month after his mother's death.[4]

The autopsy report dated December 21, 1984 indicates that Ms. Nichols' death was the product of a possible anaphylactic[5] reac-

---

**1.** Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

**2.** Zomax is a non-narcotic prescription analgesic that was manufactured and marketed by McNeil in the early 1980's. It is a non-steroidal, anti-inflammatory drug and was prescribed to reduce inflammation and pain. It was, however, associated with a large number of severe allergic reactions and was withdrawn from the market in March, 1983.

**3.** Ms. Nichols had a history of very severe menstrual cramps.

**4.** Plaintiff also asserts that no Midol or aspirin or any other drug which could have caused a similar allergic reaction was found in the trailer.

**5.** An anaphylactic reaction is an immediate transient allergic reaction or shock characterized by the contraction of smooth muscle and dilation of the capillaries. Anderson Publishing Co., *Stedman's Illustrated Medical Dictionary* 62 [5th ed. 1982].

tion and probably the result of "drug intoxication." The autopsy report also indicates that the decedent's stomach contained a "white curdled" substance which may have been a dissolved pill or capsule. The medical examiner noted that specimens of blood, bile and gastric contents were collected and forwarded to a toxicology laboratory to be tested for the presence of Midol, Zomax, alcohol and any other noxious drugs.[6]

The toxicology report from December 27, 1984 indicates that the drug screen was negative for the presence of "screen drugs" in the decedent's blood and bile and that nothing could be determined from her gastric contents due to the nature of the specimen. An affidavit dated May 15, 1990 given by the laboratory technician who performed the tests on those samples indicates that the files on Ms. Nichols' case have been purged by his employer, as have all the laboratory's files from 1984. The technician further states that he would not have tested for Zomax in the ordinary course of a "drug screen." In any case, there is no evidence whether a test for Zomax was specifically performed in this case and, if so, whether Zomax was present in the decedent's system.

The preceding paragraphs summarize the extent of the arguably admissible evidence plaintiff proposes to offer in support of his *prima facie* case against McNeil as the manufacturer of Zomax.[7] McNeil contends that plaintiff has failed to make out a *prima facie* case because there is simply no evidence that Ms. Nichols took Zomax on the morning of her death. Absent more concrete evidence that the deceased actually ingested Zomax, defendant argues that summary judgment must be granted in its favor.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there is no genuine issue of material fact. The burden is first on the moving party to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hines v. Joy Manuf.,* 850 F.2d 1146, 1149–50 (6th Cir.1988); *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). Once the moving party presents sufficient evidence to support the motion, the burden shifts to the adverse party to set forth specific facts showing a genuine triable issue. *Fed.R.Civ.P.* 56(e); *Gregg* at 861.

Summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553. In deciding the question, the Court must bear in mind the quantum and quality of proof necessary to support liability at trial. The standard mirrors that governing a directed verdict under Federal Rule of Civil Procedure 50(a). The inquiry under each is the same: Whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the movant has carried its initial burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). With this standard in mind, I will now turn to an evaluation of the issues presented.

---

**6.** The autopsy report indicates that hospital personnel were informed by the daughter that Ms. Nichols had taken Zomax and Midol. The daughter has since denied making this statement and it clearly would be hearsay and inadmissible. Defendant contends that if the autopsy report is admitted as evidence of Zomax ingestion, it must also be admitted as evidence of Midol ingestion. Without expressing any opinion as to whether the report would be admitted as evidence of whether Ms. Nichols took either drug under any other theory, the report's primary value for purposes of this report is its indication that an anaphylactic reaction was a possible cause of death [independent of the issue of which particular drug might have induced the reaction].

**7.** There is additional hearsay evidence in the form of deposition testimony from Ms. Traver's daughter which plaintiff wishes the Court to consider in addressing the causation question. This however, will not be considered, as only *admissible* evidence may be evaluated in a summary judgment motion. Fed.R.Civ.P. 56(e).

## II.

*Causation*

There is no direct evidence in this record that Ms. Nichols took Zomax on December 21, 1984 and no witness claims ever to have observed Ms. Nichols take a Zomax tablet at any time during the two years prior to her death. It is fundamental in a products liability action that the injury or damages be causally linked to a product defect. *Spencer v. Ford Motor Co.,* 141 Mich.App. 356, 367 N.W.2d 393 (1985) [citing *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 324, 343 N.W.2d 164 (1984) ]. Even before getting to the defect or duty to warn question, proof of causation must of course include some evidence that the plaintiff actually came into contact or used the defendant's product.

Plaintiff contends that the admissible evidence leads to the natural inference that, to alleviate her severe menstrual cramps in the early morning hours of December 21, 1984, plaintiff took Zomax, the only pain reliever found in the trailer after her death. Moreover, while conceding the circumstantial nature of the evidence, plaintiff argues that Michigan law permits the use of circumstantial evidence to establish a *prima facie* case in products liability actions. *See Bronson v. J.L. Hudson,* 376 Mich. 98, 135 N.W.2d 388 (1965); *Holloway v. General Motors Corp.,* 403 Mich. 614, 271 N.W.2d 777 (1978). It is equally true, however, that the issue of causation must not rest on "pure speculation or conjecture." *W. Prosser & W. Keeton, Prosser and Keeton on Torts.,* § 41 at 269 [5th ed. 1984]. The question before the Court, then, is whether the proof of causation here is purely speculative or whether the circumstantial evidence outlined here would be sufficient to permit a reasonable jury to conclude that Ms. Nichols ingested Zomax on the morning of her death.

Plaintiff is correct in that there is no requirement under Michigan law that proof of causation in a products liability case must be strictly by way of direct evidence. *Holloway v. General Motors,* 403 Mich. at 621, 271 N.W.2d 777 [plaintiff meets burden where he establishes, with *either* direct or circumstantial evidence, a reasonable likelihood that defect is attributable to the manufacturer]; *Mulholland v. DEC Int'l Corp.,* 432 Mich. 395, 417, n. 19, 443 N.W.2d 340 (1989) [generally no support in Michigan law for the proposition that only direct evidence may establish causation in a products liability case]. Viewing the potentially admissible evidence in the light most favorable to plaintiff, I cannot conclude that the evidence is so one-sided that a reasonable jury would be unable to find that Twila Nichols ingested a Zomax tablet on the morning of her death.

There exists sufficient circumstantial evidence in this case for a trier of fact to reasonably conclude that Ms. Nichols did in fact take Zomax on the morning of her death. Construed in the light most favorable to plaintiff, the evidence reveals that Ms. Nichols died suddenly and unexpectedly of a possible anaphylactic reaction. The autopsy report indicates that a substance resembling a dissolved pill was found in her stomach. Zomax, an analgesic prescribed to treat plaintiff's severe menstrual pain, was found in her medicine cabinet (and no other pain relievers were found in the house). Plaintiff had complained of severe menstrual cramps the evening before she died. Finally, Zomax is known to cause anaphylactic reactions and had been withdrawn from the market after it was associated with an unusually high number of severe allergic reactions, including several fatal ones. In sum, the circumstantial evidence is not so weak or one-sided that a trier of fact could not reasonably find that Ms. Nichols took a Zomax tablet shortly before her death. The causation issue alone, therefore, would not warrant granting McNeil's motion for summary judgment.[8]

## III.

*Duty to Warn*

When Zomax was prescribed to Ms. Nichols in December, 1982, the warnings regard-

---

8. McNeil also argues that Ms. Nichols' reaction could have been caused by Midol or one of the other analgesics she had been prescribed. Plaintiff has presented deposition testimony that no Midol was found in the decedent's home. Similarly, there are no pharmacy records indicating that Ms. Nichols had the prescriptions for any other pain relievers filled. In any case, this is a question of comparative probabilities and, as such, would be one for the trier of fact to consider. *Holloway,* 403 Mich. at 622, 271 N.W.2d 777.

ing its side effects provided to physicians by McNeil included statements regarding the risks of allergic reactions, especially among persons known to be sensitive to aspirin. When the drug was withdrawn from the market in March, 1983 [9], McNeil sent letters and mailgrams to physicians indicating that Zomax was being withdrawn from the market for relabelling and that patients were to be instructed to discontinue taking Zomax and return their prescription to their pharmacist.[10]

Coinciding with the removal of Zomax from the market, McNeil issued press releases concerning its decision to withdraw the drug from the market. The story was picked up and run as front page news by some newspapers.

### Assumed Duty to Warn Public Directly

As will be discussed in greater detail later, McNeil contends that it had absolutely no duty to warn the consuming public of Zomax's withdrawal and it also asserts that only physicians were the targeted recipients of its press release. As McNeil argues, the press release helped reinforce the message conveyed to physicians directly and that alerting the public of Zomax's withdrawal was merely an unavoidable by-product of warning physicians in this particular manner.

Plaintiff argues that, even if defendant had no duty to warn consumers directly, it voluntarily assumed this duty by issuing the press release. Without citing any even remotely related case law to support its theory, plaintiff claims McNeil voluntarily assumed the duty to warn consumers of Zomax's dangers and then failed to take reasonable care to ensure that the public got the message.

Plaintiff relies on the Restatement [2nd] of Torts, § 324A as creating the duty.[11]

Even if McNeil had a duty to warn the consuming public directly of its decision to withdrawn Zomax from the market, the duty cannot be based on § 324A. McNeil merely issued a statement to the media regarding its decision to remove Zomax from the market. Whether or not the story was picked up by the media is strictly a matter of editorial discretion. In other words, if McNeil had voluntarily decided to assume the duty of warning the public by taking out, for example, paid advertisements, then perhaps it may have been held to a standard of reasonable care in ensuring that the ads were calculated to reach a broad segment of the public. However, a simple press release may or may not be of interest to the media—it may be the basis for a front page story or it may end up in the editor's wastebasket. In either case, the person issuing the press release has little or no control over whether its message reaches the public.

Plaintiff has failed to cite a single case analogous to this situation and, as I stated on the record during oral argument, I am unwilling to apply § 324A to a situation such as this where the defendants' purported "duty" to warn rests on the discretionary acts of unrelated third parties. Moreover, recognizing a general duty under § 324A would provide an incentive for pharmaceutical companies to remain silent about the risks associated with their products, rather than encourage the dissemination of such information.

### Learned Intermediary Doctrine

Generally, a manufacturer has a duty to warn users of dangers known to be inherent

---

9. The withdrawal followed reports of an unusually large number of adverse reactions among persons taking Zomax and there is some suggestion that people who took the drug intermittently (i.e., on an "as needed" basis for pain) were most at risk.

10. Pharmacists were similarly warned not to fill Zomax prescriptions and to give refunds.

11. Section 324A provides that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or this things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [sic; perform] his undertaking, if
(a) his failure to exercise reasonable care increases the risk of harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

See Smith v. Allendale Mutual Ins. Co., 410 Mich. 685, 303 N.W.2d 702, 709 (1981); Ray v. Transamerica Ins. Co., 46 Mich.App. 647, 208 N.W.2d 610 (1973).

in the product.[12] Prescriptions drugs, however, are characterized as "unavoidably unsafe" products and a manufacturer can be held liable for their side effects only if the manufacturer failed to supply an adequate warning in light of the information then available. Restatement (2nd) of Torts, § 402A, comment K (1965); *Werner v. Upjohn Co.*, 628 F.2d 848 (4th Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). With prescription drugs, then, the duty to warn runs from the manufacturer to the physician and not directly to the patient. *Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 88, 273 N.W.2d 476 (1979). *See, In re Certified Questions*, 419 Mich. 686, 358 N.W.2d 873 (1984); *Dunn v. Lederle Laboratories*, 121 Mich.App. 73, 79, 328 N.W.2d 576 (1982).[13]

Michigan law would indicate that a manufacturer of pharmaceuticals is absolved from liability for the side effects of its products where prescribing physicians have been adequately warned about the risks attendant with the use of the particular drug. *Mowery v. Crittenton Hospital*, 155 Mich.App. 711, 720–21, 400 N.W.2d 633 (1986). The physician, it is said, acts as the "learned intermediary," prescribing medication based on his or her assessment of the plaintiff's particular needs and the medical suitability of various drugs. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974).

As plaintiff emphasizes, Ms. Nichols was prescribed Zomax during a one-time visit to the emergency room, while seeking relief from cyclic menstrual pain and while being seen by a physician with whom she would probably never treat with again. Dr. Gawronski, the prescribing emergency room physician, was given notice of Zomax's withdrawal from the market in March, 1983. McNeil argues that this satisfied its duty to warn about the dangers of Zomax. McNeil characterizes its duty to warn in this case as running solely to the emergency room physician.

In the cases discussed in the parties' briefs, the learned intermediary doctrine unquestionably applies where the physician prescribes a drug based on his or her evaluation of the patient's particular characteristics and the drug's risks and benefits. The rationale behind the doctrine has been stated as avoiding the confusion and unnecessary interference with the doctor/patient relationship which might result if drug manufacturers were required to warn patients directly of their drug's possible side effects. *Reyes v. Wyeth Laboratories*, 498 F.2d at 1276; *Mowery, supra*. While absolving the pharmaceutical company from liability, the doctrine places a corollary duty on the physician to evaluate the risks of side effects in light of each patients' medical needs. *See In re Certified Questions*, 419 Mich. at 698, 358 N.W.2d 873 [court declined to state a rule of law defining a drug manufacturer's duty to warn consumers because of its impact on the duties of physicians as well]; *Reyes, supra*.

By relying on the learned intermediary doctrine on the facts of this case, however, McNeil is in effect arguing that *physicians* were the ones responsible for ensuring that Zomax was removed from the medicine cabinets of consumers. Although it makes sense that physicians act as "learned intermediaries" when *prescribing* drugs, it seems odd that, under this doctrine, the manufacturer of a drug can pass off its responsibility for *informing* the consuming public of the drug's newly-discovered dangers when it withdraws the product from the market.

As defendant correctly states, the sole issue before the court is whether McNeil provided warnings which were adequate in light of the information then available. After a careful review of the parties' arguments and the case law offered in their support, I am convinced that genuine issues of fact and law preclude the granting of summary judgment in this case. First, a genuine issue of fact remains as to whether the warnings given to physicians regarding Zomax's side effects

---

12. Prosser, *Torts* (4th ed.), pp. 646–47.

13. In its discussion in *In re Certified Questions*, the Michigan Supreme Court stated that the apparent adoption of the learned intermediary doctrine in *Squibb* was merely dicta. 419 Mich. at

697, 358 N.W.2d 873. However, the proposition has been treated as if it was generally accepted within Michigan law. *Mowery*, 155 Mich.App. at 719–20, 400 N.W.2d 633.

were adequate in light of what McNeil officials knew by December of 1982. Second, the parties have entirely failed to discuss whether a manufacturer of a product—be it a prescription drug, a laundry detergent, or an automobile—has an enhanced duty to warn the consuming public directly of its product's dangers once it finds it necessary to withdraw that product from the market.

As to the first question, there is no question but that, during the time Zomax was still on the market, McNeil had a legal duty to adequately warn physicians of the risks associated with its use. Genuine issues remain as to whether the risks of anaphylactic reactions increase with the patients' intermittent use of the drug and whether the warnings available to prescribing physicians were adequate in light of the reports of allergic reactions McNeil had received by December of 1982.[14]

As to the question of whether a manufacturer which withdraws its product from the market has a duty to warn running directly to the public, the parties have not briefed this issue and Michigan law in this area is quite uncertain. Although the Supreme Court of Michigan has declined to decide whether manufacturers of prescription pharmaceuticals have a duty to warn the public directly of their drugs' potential side effects, *In re Certified Questions,* 419 Mich. at 698, 358 N.W.2d 873; *Mowery,* 155 Mich.App. at 720–21, 400 N.W.2d 633, there is some indication that the learned intermediary doctrine may be inapplicable where the alleged failure to warn does not involve the *prescribing* of a drug by a physician, but the *withdrawal* of a product from the market by its manufacturer.[15] It would also be helpful to analyze whether the manufacturer of *any* type of product has a legal obligation to warn the public of the product's dangers when the decision has been made to withdraw it from the market. If such a duty to warn the public exists independently of the initial duty to warn physicians, then the adequacy of such warnings must be considered in light of the information issued to the public during or after Zomax's withdrawal in March of 1983.

### Conclusion

In sum, although plaintiff's proof of causation is rather weak, it cannot be said that a trier of fact could not reasonably find that Twila Nichols ingested Zomax and died from an allergic reaction attributable to it. Furthermore, although plaintiff fails to state a claim based on § 324A of the Restatement (2nd) Torts, there nevertheless remain issues of fact and law relating to McNeil's duty to warn which precludes granting its motion for summary judgment. I therefore respectfully recommend that the defendant's motion for summary judgment be denied without prejudice to its readdressing the duty to warn issues discussed in Part III of this report.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of this report they may serve and file specific, written objections to the proposed findings and recommendations. Further, either party may respond to another party's

14. McNeil argues that the adequacy in its April, 1982 warnings is irrelevant because, in March, 1983, it gave the "ultimate warning" by withdrawing Zomax. This argument is clearly without merit. Given that Ms. Nichols was prescribed Zomax in December, 1982, the court's inquiry must focus on the warnings available to physicians *at that time.* The mere fact that Zomax was withdrawn from the market three months after it was prescribed to Ms. Nichols is irrelevant for purposes of assessing the adequacy of the warnings given to prescribing physicians while the drug was still on the market.

15. Two cases involving the withdrawal of health-related products from the market and the manufacturer's duty to warn may be relevant. *Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613, 617,

620 (8th Cir.1983) [some discussion of tampon manufacturer's duty to warn regarding risk of toxic shock syndrome associated with a product which was withdrawn from the market]; *Worsham v. A.H. Robins Co.,* 734 F.2d 676, 686 (11th Cir.1984) [duty to warn may be found when manufacturer of intrauterine device received information concerning possible health problems linked to use of its devices]. Needless to say, these cases do not deal directly with the duty to warn as it relates to prescription pharmaceuticals and do not turn on Michigan law. However, this court's obligation is to determine, if not what Michigan law is, then what it would be if a Michigan court were presented with this question. *Odgers v. Ortho Pharmaceutical Corp.,* 609 F.Supp. 867, 869–70 (E.D.Mich.1985).

objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted.

Date: June 6, 1990.